## GAREY et al. v. ST. JOE MINING CO.

No. 1854. Decided June 26, 1907 (91 Pac. 369).

1. CORPORATIONS — CHARTER — NATURE OF CONTRACT. A corporation's charter is a contract between the state and the corporation, between the corporation and the stockholders, and between the stockholders and the state.

2. SAME — AMENDMENT — POWER OF STATE. In granting charters or authorizing the creation of corporations under general laws, the state may expressly reserve the power of alteration, amendment, or repeal, and such reservation becomes a part of the contract between the state and the corporation, and is binding, not only upon the corporation, but also upon every individual stockholder.

3. SAME. Under the constitutional provision that all laws relating to corporations may be amended or repealed, and all corporations doing business in the state may as to such business be regulated or restrained by law, the state may not amend charters of existing corporations, so as to change the fundamental character of the corporation, impair the object of the grant or rights vested thereunder, nor amend them in such way as will impair the contractual relations or rights of the stockholders among themselves, or between the corporation and its stockholders; but the Legislature has the right to amend the charter or laws relating thereto, so far as the state is interested, to modify any right, privilege, or immunity granted by the state, to repeal the charter or all laws under which it was granted, to take away altogether the franchises and privileges granted under it, and to make such reasonable amendments or alterations deemed necessary to carry into effect the purposes to the grant or to protect the rights of the public, of the incorporation, and its stockholders, when such amendments or alterations will not defeat or substantially impair the object of the grant or any vested rights.

4. CONSTITUTIONAL LAW — OBLIGATION OF CONTRACTS — CORPORATIONS. A statute authorizing majority stockholders to amend the articles of incorporation against the consent of the minority, so as to make nonassessable full-paid capital stock assessable and subject to sale for such assessment, affects the contractual relations of the stockholders among themselves, and is an impairment of the obligation of a contract, within the prohibition of the federal Constitution.

5. CORPORATIONS — ARTICLES — RIGHT TO AMEND — AFFECTING NON-ASSESSABLE STOCK. Under Revised Statutes 1898, section 338, as

32 Utah—32

amended by Sess. Laws 1903, p. 80, c. 94, providing that articles of incorporation may be amended in any respect conformable to the state laws by a vote representing two-thirds of the outstanding capital stock, provided the personal or individual liability of full-paid capital stock for assessments, etc., shall not be changed without the consent of all the stockholders, such majority stockholders may not amend the articles of incorporation against the consent of the minority, so as to make nonassessable full-paid capital stock assessable.

APPEAL from District Court, Third District; C. W. Morse, Judge.

Action by Ellen Garey and others against the St. Joe Mining Company. From a judgment sustaining defendant's demurrer, plaintiffs appeal.

REVERSED AND REMANDED.

*Lawrence & Robertson* and *E. A. Walton* for appellants.

*D. H. Wenger* and *E. B. Critchlow* for respondent.

### APPELLANT'S POINTS.

It is an elementary proposition that positive laws which subsist at the time and place of the making of a contract, enter into and form a part of it as much as if they were expressly referred to, or incorporated in its terms. (Bishop on Contracts, 567, *et seq.; Von Hoffman v. City of Quincy,* 4 Wall. 535; *Green v. Biddle,* 8 Wheat. 92; *Bronson v. Kinzie,* 1 How. 319; *Ogden v. Sanders,* 12 Wheat. 231.)

The Legislature cannot authorize the majority to bind the minority in respect of the acceptance of a fundamental amendment. *Railroad v. Harris,* 27 Miss. 517; *Mills v. Railroad,* 41 N. J. Eq. 1; *Ditch Company v. Moffat,* 58 Neb. 642.)

"The property of a corporation cannot be taken by the exercise of the reserved power." (*Detroit v. Plank Road Co.,* 43 Mich. 140.)

"These general powers of amendment of the certificate

which originally fixed the relation between the stockholders *inter sese,* do not confer the power of altering the previous contract of the company itself, with the stockholders . . . such alteration would impair the obligation of the contract created by the stock certificate issued under the company's charter." (*Keene v. Johnson,* 9 N. J. Eq. 401; *Schwarzwalder v. Insurance Co.,* 58 N. J. Eq. 589. The Railroad Tax Case, 13 Fed. 722.)

The notion that the provision reserving the power to amend, alter or repeal, becomes, like a subsisting positive statute, a part of the original contract so as to avoid the inhibition of the Federal Constitution is utterly dissipated by the cases of *Harrison v. Paper Co.* (C. C. A.), 3 L. R. A. (N. S.), 954; *Webster v. Powers,* 104 Fed. 627; *Evans v. Nellis,* 101 Fed. 920.

An amendment made under the reserved power cannot affect the rights of previous creditors of the corporation. (*Bank v. McVeigh,* 20 Gratt. 457; *Woodworth v. Bowles* [Kan.], 60 Pac. 331; *Hawthorne v. Calif.,* 2 Wall. 10; *Whitman v. Bank,* 176 U. S. 559.)

RESPONDENT'S POINTS.

And the reservation in the Constitution at the time of the organization of the corporation reserved to the Legislature the rights to make any changes in the law, and that such changes are binding upon the stockholders even if the liability of the stockholders is thereby changed. (*Tomlinson v. Jessup,* 15th Wall. 454; *Sherman v. Smith,* 1 Black [U. S.] 587, 6 Rose Notes 175; *Sleeper v. Goodman,* 67 Wis. 577; *In re Empire City Bank,* 18 N. Y. 199; *Bissell v. Heath* [Mich.], 57 N. W. 587; Dartmouth College Case, 1 Rose Notes 937; *Allen v. Mining Company* [Mont.], 77 Pac. 47; *Hinckley v. Schwarzchild,* 95 N. Y. Supp. 357; *Gregg v. Granby* [Mo.], 65 S. W. 314; *Venner v. U. S. Steel,* 116 Fed. 1013.)

Thompson in his Commentaries on the Law of Corporations, Vol. 4, sec. 5417, states: "And so, it seems that if the power to alter or amend a charter has been reserved to the

Legislature, that power may be exercised, in furtherance of the ends for which the corporation was created, by passing an act enabling the corporation, in the event of having sustained losses, to fill up those losses by making assessments against the shareholders, beyond what the corporation was originally empowered to do. Such a statute does not, it is held, impair the obligation of the contract between the stockholder and the corporation; but on the contrary, it is to be assumed that the stockholder entered into his engagement with the corporation in view of the fact that the legislature had reserved the right to exercise such power." (*Gardner v. Insurance Co.*, 9 R. I. 194, 11 Am. 238; *Bailey v. Trustees*, 6 R. I. 491; *Com. v. Essex County*, 13 Gray [Mass.], 239; *Railroad v. Veazie*, 39 Me. 671; *Meadow Dam Co. v. Gray*, 30 Me. 547.)

STRAUP, J.

This action is brought by plaintiffs against the defendant, a mining corporation organized under the laws of the state of Utah, to restrain it from selling certain full-paid capital stock of the corporation owned by plaintiffs for the nonpayment of an assessment levied against the stock by the board of directors. It is alleged in the complaint, among other things, that the capital stock of the corporation is divided into one million shares, of the par value of $1 each, of which the plaintiffs are the owners of 149,881 shares; that all the outstanding capital stock is fully paid; that by the terms of the original articles of agreement of incorporation it was agreed by all of the incorporators that "the stock of this company shall be non-assessable;" that under the laws of Utah in force at the time the articles of agreement were made the articles could not be amended so as to make the full-paid capital stock of the corporation assessable without the consent of all the stockholders, and that defendant issued and sold to its stockholders its fully paid and nonassessable shares, represented by certificates signed by its officers, and that each certificate on its face provided that the shares were and are nonassessable; that in pursuance of a call made by the board of directors a stock-

holders' meeting was held on February 5, 1907, for the purpose of amending the articles so as to authorize the board of directors, for the purpose of paying the expenses, conducting the business, and paying the debts of the corporation, to levy and collect assessments in the manner and form as provided by law, and so that such assessments might be levied and collected before the working capital stock of the corporation was exhausted; that at said meeting 819,636 shares of the outstanding capital stock were represented, of which 635,464 shares voted for the amendment and 184,172 shares voted against the amendment, 122,364 shares of the outstanding capital stock not being represented, the holders of which, it is alleged, withheld their consent to the amendment by not voting for it, and that the holders of the 635,464 shares, in violation of the terms of the articles of agreement of incorporation, wrongfully and illegally assumed to declare the pretended amendment approved and adopted; that in pursuance of the amendment and of the pretended authority conferred upon them thereby, the board of directors, on February 15, 1907, levied an assessment of two cents per share upon all the outstanding full-paid capital stock payable immediately and declared it delinquent on the 25th day of March, 1907, and directed that delinquent stock be advertised and sold on the 16th day of April, 1907, unless the assessment was sooner paid; that the levy of the assessment was illegal and wrongful, and that, unless restrained, the defendant will sell plaintiffs' stock for nonpayment of the assessment. The court sustained the defendant's demurrer to this complaint for want of facts. The correctness of this ruling is questioned by this appeal.

It is alleged that the defendant was organized in the year 1897. It was organized under the laws of 1888 and 1894. So far as concerns this case the laws of 1896 relating to corporations are a mere re-enactment of the laws of 1888, and in no manner repealed or affected the laws of 1894. The laws of 1888, as re-enacted in 1896, provided that the name of the corporation might be altered, the number of its directors or officers changed, and that the articles of agreement of incor-

poration might be otherwise changed or amended, provided such amendment did not alter the original purpose of the incorporation, but no such change should be made except by a vote representing at least two-thirds of the capital stock at a stockholders meeting called for that purpose. Section 2393 of the Compiled Laws of Utah of 1888 provided that:

"Any person who is the holder of full-paid up capital stock, shall not be liable for any assessments or for any indebtedness of the corporation otherwise than by sale of his or her stock, as herein provided, unless distinctly provided for in the articles of incorporation, which articles, or incorporation shall not be changed in this respect without the consent of all the stockholders in writing."

This section was amended by the Legislature in the year 1894 (chapter 70, p. 119, Sess. Laws 1894) to read:

"Any person who is the holder of full-paid up capital stock of any corporation hereafter organized under the laws of Utah Territory, shall not be liable for any assessments upon such capital stock or for any indebtedness of the corporation, nor shall any assessment be levied upon such capital stock for any purpose whatever, nor shall any such holder be liable for assessments or indebtedness of the corporation, except it shall be provided in the articles of incorporation or the agreement in writing specified in section 2268, subd. 2, of said Compiled Laws, that such capital stock shall be liable for assessments or for the indebtedness of the corporation, then the corporation shall be and is authorized to levy assessments upon such stock, to be collected as in the articles provided. The articles of incorporation, in this respect, shall not be changed without the consent of all the stockholders."

The section as amended was not repealed nor modified by the Laws of 1896. This section as amended was substantially incorporated into sections 331 and 354 of the Revised Statutes of 1898, which are as follows:

Section 331: "The property of the corporation and the unpaid stock shall be liable for the debts of the corporation; but the individual property of any holder of full-paid capital stock of any corporation organized since March eighth, eighteen hundred ,and ninety-four, or that hereafter may be organized, under the laws of this state, except as otherwise expressly provided in this title, shall not be liable for the corporate obligations, nor shall assessments be levied on such stock for any purpose whatever, except to such extent and in such manner as may be expressly provided in the articles of incorporation."

Section 354: "The full-paid capital stock of any corporation organized since March eighth, eighteen hundred and ninety-four, or that hereafter may be organized under the laws of this state, shall not be assessable for any purpose whatever, except to such extent and in such manner as may be expressly provided in the articles of incorporation: provided, that if such stock is made assessable and the manner of levying the assessment is not provided for, it shall be levied in the manner and form hereinafter prescribed."

## Section 338, Rev. St. 1898, provides:

"The articles of incorporation of any corporation now existing, or that hereafter may be organized under the laws of this state, may be amended in any respect conformable to the provisions of this chapter by a vote representing at least two-thirds of the outstanding capital stock thereof at a stockholders' meeting called for that purpose, as hereinafter prescribed: provided, that the original purpose of the corporation shall not be altered, nor shall the capital stock be diminished to an amount less than fifty per cent. in excess of the indebtedness of the corporation; and provided further, that the liability of the holder of full-paid capital stock for assessments or for the indebtedness of the corporation shall not be changed without the consent of all the stockholders."

In 1903 (Sess. Laws 1903, p. 80, c. 94) the Legislature amended section 338 of the Revised Statutes to read:

"The articles of incorporation of any corporation now existing, or that hereafter may be organized under the laws of this state, may be amended in any respect conformable to the laws of this state by a vote representing at least two-thirds of the outstanding capital stock thereof at a stockholders' meeting called for that purpose as hereinafter prescribed: provided, that the original purpose of the corporation shall not be altered, nor shall the capital stock be diminished to an amount less than fifty per cent. in excess of the indebtedness of the corporation; and provided, further, that the personal or individual liability of the holder of full-paid capital stock for assessments or for the indebtedness or obligations of the corporation shall not be changed without the consent of all the stockholders."

Section 1, art. 12, of the Constitution of Utah, adopted in 1896, is as follows:

"Corporations may be formed under general laws, but shall not be created by special acts. All laws relating to corporations may be altered, amended or repealed by the Legislature, and all corporations doing business in this state, may, as to such business, be regulated, limited or restrained by law."

It is contended by the respondent that, under section 338 of the Revised Statutes, as amended by the Session Laws of 1903, two-thirds of the stockholders of the outstanding capital stock were authorized to amend the articles of incorporation against the consent of the minority, so as to make nonassessable full-paid capital stock assessable, and to empower the board of directors to levy an assessment on such stock, and that the Legislature, under the reserved power of the Constitution, was authorized to make such legislation and thereby to affect existing corporations, and hence such legislation was not violative of the federal Constitution, placing an inhibition on the impairment of contracts and the taking of property without due process of law. On the other hand, it is contended by appellant: (1) That neither section 338, as contained in the Revised Statutes, nor as amended by the Laws of 1903, gave any number of stockholders less than the whole the right to make such an amendment; and (2) if it were intended by the Legislature to confer such a power, the right so to do was not within the reservation of the Constitution, for that it was violative of the federal Constitution, prohibiting states from impairing the obligations of contracts and the taking of property without due process of law. The meaning of the phrase in the proviso of section 338 as amended, "that the personal or individual liability" of the holder of full-paid capital stock for assessment or for the indebtedness or obligations of the corporation shall not be changed without the consent of all the stockholders, is not as clear as it might be. It is argued by respondent that the meaning thereof is that two-thirds of the stockholders might so amend the articles as to create what is called a mere stock liability for assessments or for the indebtedness or obligations of the corporation against a dissenting minority, but that no amendment of the articles could be made, so as to create any kind of liability other than one for a sale or forfeiture of stock, without the consent of all the stockholders. On the other hand, it is argued with much plausibility that full-paid capital stock of a private corporation is the individual and personal property of the stockholder to the same extent as is his

chattel, and when specific property of his is made liable for a certain thing or things to that extent he is made personally and individually liable, and hence, in order to change the articles, under the laws of 1903, whereby such a liability is created, a consent of all the stockholders is essential. For the purpose of a consideration and a decision of the other question involved, we will assume, without deciding the point, that the meaning of "personal or individual liability," as used in the statute, does not include a mere stock liability, and that it was the intention of the Legislature, among other things, to confer the power upon two-thirds of the stockholders of a corporation to amend the articles of incorporation so as to make full-paid nonassessable capital stock assessable against a dissenting minority, and therefore the action taken by two-thirds of the stockholders was within the power conferred by the amendment of 1903. This, then, brings us to the troublesome and greatly controverted question as to whether the Legislature had the authority to confer such a power upon any number of stockholders less than the whole, and as to its effect upon corporations existing when the act was passed.

It is a well recognized principle of law that,

"The charter of a corporation having a capital stock is a contract between three parties and forms the basis of three distinct contracts. The charter is a contract between the state and the corporation; second, it is a contract between the corporation and the stockholders; third, it is a contract between the stockholders and the state." (2 Cook on Corp. [5th Ed.], section 492; 1 Clark & Mar. Priv. Corp., section 271f.)

It is also the general rule that, in granting charters or authorizing the creation of corporations under general laws, the state may expressly reserve the power of alteration, amendment, or repeal, and such reservation becomes a part of the contract between the state and the corporation, and is binding, not only upon the corporation, but also upon every individual stockholder (3 Clark & Mar. Priv. Corp., section 631 f.) In the case of *Dartmouth College v. Woodward*, 4 Wheat. (U. S.) 518, 4 L. Ed. 629, it was held that the charter from a state to a private corporation created a contract

within the meaning of the federal Constitution, forbidding any state to pass any law impairing the obligation of contracts, and hence the federal Constitution prevented a change by legislative enactment of a charter so issued. All of the text-writers and all the cases upon the subject agree that, to avoid the application of the rule laid down in that case, many of the states, either by a constitutional or statutory provision, provided a limitation upon corporate power by reserving the right to alter, amend, or repeal the charters granted to any corporation, or the laws under which it was created. While the language used in the Constitutions or statutes of the various states defining the reserved power is somewhat different, yet all the authorities agree that the purpose thereof was to avoid the application of the rule announced in the *Dartmouth College Case.* In all these Constitutions and statutes, so far as we have been able to see, the reservation is as comprehensive and sweeping as is contained in our Constitution; all of them containing the words "alter, amend or repeal," or "alter, repeal or suspend," or "alter or repeal," or words of like kind without limitation or condition. Our Constitution is:

"All laws relating to corporations may be altered, amended or repealed by the Legislature, and all corporations doing business in this state may, as to such business, be regulated, limited or restrained by law." In this respect our Constitution is no broader than that of other states. The important question is: Does the legislative enactment here in question fall within this reserved power?

Without much reflection it might seem that almost any kind of legislation relating to corporations would fall within the reservation of such Constitutions. But, again, all the authorities agree that the power reserved by the various Constitutions or statutes has its limitation, and that thereunder certain acts may be done by the Legislature without violating the federal Constitution, forbidding the impairment of contracts or taking property without due process of law, while certain other things may not be done. It becomes important, therefore, to inquire what power is reserved by these constitutional provisions, and upon this question we find much

diversity of opinion in the cases. While it is settled that the power is not unlimited, yet it is very difficult to say what its limitations are. It has well been stated by Clark & Marshall, in their work on Private Corporations (volume 3, section 631f.):

"The difficulty has been in construing such a reservation and determining what amendments are properly within it, and on this question there has been some difference of opinion. There is no use trying to reconcile all the decisions on this point, for they are irreconcilable."

Reference, however, to the text-writers and the cases will aid us in determining whether the legislative enactment in question does or does not fall within the power.

In discussing this question the authors just named, at section 631b, say:

"And it is equally clear that, if the state has not reserved the power to alter, amend, or repeal the charter of the corporation, or if, although there is such a reservation, it is to be construed, as is held by most courts, as intended merely for the protection of the public, and not for the purpose of enabling the Legislature to change the contract between the corporation and its stockholders, the Legislature has no power to authorize a majority of the stockholders to bind the minority by accepting such an amendment; for this would be to impair the obligation of the contract between the corporation and the dissenting stockholders, by forcing them into a different contract, and therefore would be within the constitutional prohibition against laws impairing the obligation of contracts."

At section 631f, it is further observed by them:

"The true view is that the power to alter, amend, or repeal charters is reserved by the state solely for the purpose of avoiding the effect of the decision in the Dartmouth College Case, that the charter of a corporation is a contract between the state and the corporation within the constitutional prohibition against laws impairing the obligation of contracts, and of enabling the state to impose such restraints upon corporations as the Legislature may deem advisable for protection of the public, and not for the purpose of avoiding the effect of the doctrine in Natusch v. Irving. Such power is not reserved in any sense for the benefit of the corporation, or of the majority of the stockholders, upon any idea that the Legislature can alter the contract between the corporation and its stockholders, nor for the purpose of enabling it to do so."

And at section 275a they say that, under the reserved power, the Legislature may make "any alteration or amendment in the charter

which will not defeat or substantially impair the object of the grant, or rights of property which have vested under it, and which the Legislature may deem necessary to secure either that object or any other public or private rights. The power, it has been said, may be exercised in all cases and to any extent to carry out the original purposes of the incorporation, and to secure the due administration of justice in regard to the rights of the creditors of the corporation and the proper disposition of its assets."

At section 501 of Cook on Corporations (5th Ed.) it is said:

"The extent of the power of the Legislature to amend a charter where it has reserved that power, is not yet fully settled, and is full of difficulties. There is a strong tendency in the decisions, and a tendency which is deserving of the highest commendation, to limit the power of the Legislature to amend the charter under this reserved power. It should be restricted to those amendments only in which the state has a public interest. Any attempt to use this power of amendment for the purpose of authorizing a majority of the stockholders to force upon the minority a material change in the enterprise is contrary to law and against the spirit of justice. Under such reserved power the Legislature has only that right to amend the charter which it would have had in case the Dartmouth College Case had decided that the federal Constitution did not apply to corporate charters. . . . The power to make a new contract for the stockholders is not thereby given to the Legislature. The Legislature may repeal the charter, but cannot force any stockholder into a contract against his will. . . . The best view taken of this reserved power of the state is that under it a fundamental amendment of the charter does not authorize a majority of the stockholders to accept the amendment and proceed, but that unanimous consent of the stockholders is necessary."

Morawetz, in his work on Corporations, at section 1097, says:

"It was not intended by any reservation in a charter or a general law to withdraw the Legislature of a state from its properly legislative duties, and make it the arbiter over private rights. It is not the purpose of a provision of this nature to give the Legislature of a state fatherly control over the affairs of private corporations. The right is reserved for the benefit of the public and can be exercised only for public purposes."

And at section 1098, he says: "The nature of a corporation is, therefore, an important consideration in determining the extent of the reserved right of the state to alter or amend its charter. In some corporations the public is interested, and in others it is not; and the right of interfering in their management varies accordingly. The Legisla-

ture of a state is authorized to alter the charter of a corporation, or interfere in its management, without the consent of the shareholders, only so far as the welfare and convenience of the public may require."

In 1 Beach on Private Corporations, section 40, it is said that under the reserved right:

"An amendment must not defeat or substantially impair the object of the grant, or any rights of property vested under it, nor deprive the incorporators of control of the corporate property, nor divest or impair the rights of the shareholders as between themselves, nor alter the relation between the corporation and subscribers to its stock, nor work injustice to the incorporators or to the corporate creditors."

In 4 Thompson's Commentaries on the Law of Corporations, section 5417, it is said:

"It may be added that there is a view to the effect that, even where the right to repeal or alter a charter has been reserved to the Legislature, the right cannot be so exercised as to interfere with contract rights subsisting between the corporation and its stockholders. The theory is that, while the Legislature may alter and amend charters, yet it cannot compel dissenting stockholders to accept such alterations and amendments; in other words, it cannot force them into a new contract into which they did not agree to enter."

Black, in his work on Constitutional Law, at page 535, says:

"This power may be reserved in the particular charter itself, but it is equally effective if the state Constitution or a statute, in force when the charter is granted, reserves to the Legislature the right to revoke or modify it. In the latter case, the reservation becomes a part of the contract. But the exercise of this power must be reasonable, and must have relation to the original nature and scope of the charter. It cannot be employed as a means of forcing the corporation into enterprises not contemplated by the charter, nor to deprive the corporators of their property, nor to abridge the lawful rights of the stockholders."

Spelling, in his work on Private Corporations, at section 1028, says:

"But the effect of such reservations is not as far-reaching and important as might be supposed without due reflection. The contract between the state and the corporation with respect to the grant of the franchise of being a corporation is of little significance in comparison with the innumerable collateral agreements depending upon the exercise of the franchise and into which the express and implied terms of

the charter become incorporated. No reservation of amendment and alteration, however broad and sweeping, will authorize a disturbance of vested rights or take away or divest corporate funds without compensation or due process of law."

In *Looker v. Maynard,* 179 U. S. 46, 21 Sup. Ct. 21, 45 L. Ed. 79, in speaking of the effect of the reservation, the court says the power may be exercised by the Legislature *when it* will "not defeat or substantially impair the object of the grant, or any right vested under the grant, and which the Legislature may deem necessary to carry into effect the purpose of the grant, or to protect the rights of the public or of the incorporation, its stockholders or creditors, or to promote the due administration of its affairs."

In 1 Rose's Notes on United States Reports, p. 942, it is said:

"In many of the cases, the purpose of the legislation attempted under the reserve power is the taking away of something—whether a franchise, power, privilege or immunity—which the corporation has hitherto enjoyed. . . . Under the reserve power the state . . . . may take away or it may modify that which it has granted. But that is all. Property acquired during the exercise of these powers it may not divest, contracts already executed it may not annul, acts lawful when committed it may not afterwards punish, taxes thus remitted it may not afterwards exact, and the legislation thus attempted must be prospective and not retrospective in its operation. This principle has been very clearly stated by several of the most eminent of the members of the Supreme Court of the United States"—citing numerous authorities from that court.

In *Re Newark Library Ass'n,* 64 N. J. Law 217, 43 Atl. 435, it was held that the power reserved to alter, suspend, and repeal relates to those matters which concern the public, and not to the mode of controlling the affairs of the stockholders *inter sese.* Thereunder it was held the Legislature may alter or repeal the charter and extinguish the corporate existence of the association, but that the Legislature was without power to take away from the shareholders the property which they had acquired during its existence, or to affect or change the rights of the stockholders as among themselves. To the same effect is *Pronick v. Spirits Distributing Co.,* 58 N. J. Eq. 97, 42 Atl. 586; and in the case of *Intiso v. Loan Ass'n,* 68 N.

J. Law 588, 53 Atl. 206, it was held that the power of altera-
tion, amendment, or repeal, which the state reserved in its
grant of permissive incorporation, "has no effect upon con-
tract relations arising from membership," and that it was not
competent for the Legislature to impair the obligation of
such a contract. In the case of *Zabriskie v. Hackensack &
N. Y. R. R. Co.,* 18 N. J. Eq. 178, 90 Am. Dec. 617, ap-
provingly quoted by all the text-writers, the court, in speak-
ing of the reserve power, says:

"The object and purpose of these provisions are so plain, and so
plainly expressed in the words, that it seems strange that any doubt
could be raised concerning it. It was a reservation to the state, for the
benefit of the public, to be exercised by the state only. The state was
making what had been decided to be a contract, and it reserved the
power of change, by altering, modifying, or repealing the contract.
Neither the words, nor the circumstances, nor apparent objects for
which this provision was made, can, by any fair construction, extend it
to giving a power to one part of the corporators as against the other,
which they did not have before."

In the case of *Snook v. Ga. Improvement Co.,* 83 Ga. 61,
9 S. E. 1104, it was said by the court:

"It is also held that the charter of a corporation is a contract of
a dual character: First, a contract between the state which grants
the charter and the corporation; and, secondly, a contract between the
corporation and its members. And while the state, if it reserves the
power to do so, can alter and amend the charter, and the corporation
itself cannot object to the alteration or amendment, yet the state has
no power to make any material or essential alteration in the contract
between the members themselves and the corporation."

From the texts and the cases it will be seen that under
the reservation the state is not only unauthorized to alter or
amend charters of existing corporations in such a way as
will change the fundamental character of the corporation,
impair the object of the grant, or rights vested thereunder,
but it is also unauthorized to alter or amend them in such a
way as will impair the contractual relations or rights of the
stockholders among themselves, or between the corporation and
its stockholders; and it will also be seen that under the reserv-
ed power the Legislature has only the right to amend the char-

ter, or laws with respect thereto, which it would have had in the event it had been decided in the *Dartmouth College Case* that the federal Constitution did not apply to corporate charters. The *Dartmouth College Case* did not call in question nor involve any right or relation of the corporators among themselves. It involved only the relation of the corporation and the state. Without the reservation it was held that even such relation cannot be changed without doing violence to the federal Constitution. Because of the reserved power the state may now amend or alter the charter, so far as affecting the contract with itself, and so long as it does not change the fundamental character of the corporation or impair any vested rights acquired thereunder. But, as stated by the authorities, the right is reserved for the benefit of the state and of the public and for public purposes. The power can only be exercised to the extent that the state is interested. It can alter or modify any right, privilege, or immunity granted by it. It cannot, however, reach out and impair the obligations of contracts existing between the corporation and its members, or among the corporators themselves, any more than it can impair the obligations of contracts existing between other individuals. Undoubtedly it may repeal the charter, or all laws under which it was granted, and may take away altogether the franchise and privileges granted under it. The exercise of such powers pertain directly to its contract, and was expressly reserved to the state, and with reference to which every stockholder subscribed for or purchased his stock. So, under the reserved power, the Legislature may make such reasonable amendments or alterations as it may deem necessary to carry into effect the purposes of the grant, or to protect the rights of the public, or of the incorporation and its stockholders, or to promote the due administration of its affairs, when such amendments or alterations will not defeat or substantially impair the object of the grant or any vested rights. Independent of the reservation there are many things which the state may do in the exercise of its police powers towards regulating and restricting corporate powers and functions.

When reasonably exercised, such legislative enactments do not fall within the prohibition of the federal Constitution.

Bearing in mind that the corporate charter is a dual contract—one between the state and the corporation and its stockholders, the other between the corporation and its stockholders —and that under the reserved power the state may alter or amend the former, but not the latter, the question is: Under which do the legislative enactment of 1903 and the action taken by the majority of the stockholders fall? We are of the opinion that they do not pertain to any right, privilege, or immunity which the state had granted to the corporation or to its stockholders, and that the action by such stockholders in no wise affected or was related to the contract existing between the state and the corporation. It merely pertains to and affects the contract existing among the stockholders themselves. Neither the enactment nor the stockholders' amendment of the articles purport to be for the benefit of the creditors or for the benefit of the public. Thereunder no right or privilege in favor of creditors or the public is created, and thereunder no creditor could assert any right or claim that could not have been asserted by him prior to the enactment. In the original articles of incorporation each stockholder agreed, one with the other, that his full-paid capital stock should be nonassessable. This provision might have been omitted or inserted as the corporators saw fit to agree among themselves. Neither the state nor the public were concerned, whether they agreed upon one or the other. No franchise or privilege granted by the state to the defendant or its members was dependent upon this provision. The same grant, franchise, and privileges would have been granted had the provision been omitted. Had it been omitted, no other or greater liability would have been created in favor of creditors or the public than was created by its insertion. Such a stipulation did not, then, in any wise pertain to the contract between the state and the corporation. It was manifestly intended to concern and fix the reciprocal rights of the stockholders amoung themselves, and to place a limit

upon the amount of money or capital that each was required to put into the enterprise and contribute to the corporation. The whole consideration for the agreement that no further contribution of capital to the corporation should be exacted was the mutual promise of the stockholders, the one to the other. Neither the state nor the public had anything to do with it, nor was either in any wise concerned therewith. The corporators had the undoubted right, as among themselves, to stipulate and agree as to the extent of their contributions. Each corporator had the right to determine for himself the amount of money or capital he would contribute to the enterprise and risk in the business. No subscriber or purchaser of stock could legally be made to contribute to the corporation more than he agreed to contribute. Each had the legal right to have such contribution measured by the terms of his agreement and by the laws in force at the time of its execution. To permit the Legislature to confer authority upon any number of stockholders less than the whole to bind a dissenting minority to another and a different agreement in such respect is to force them into a contract which they never made and which they are not willing to make. To do so is to confer the power on the majority to determine the amount of contributions that each stockholder is required to make. If in the face of the contract as here made by the corporators the majority may legally authorize the board of directors to levy one assessment, they may authorize it to levy an unlimited number of assessments, restricted only as such actions may be questioned by bad faith. In that respect a stockholder is placed in a worse position than that arising from a mere partnership, from which he may withdraw at any time and demand a distribution of assets. But here, if the action of the majority shall be upheld, a dissenting minority may be required to contribute additional capital to the corporation indefinitely, or, on their failure so to do, suffer an involuntary alienation of their full-paid capital stock, which is their private property, and forfeit all right to participate in the distribution of the assets. The exercise of such a power is something which affects the very core of

the contractual relations of the stockholders among themselves; and a legislative enactment which confers such a power is, in our judgment, an impairment of the obligation of a contract which is protected by the federal Constitution.,

We are, however, cited to cases where it has been held that it was competent for the Legislature, under the reserved power, to impose on the corporators a statutory individual liability for the future debts and obligations of the corporation, when, under the charter as orginally granted, no such liability was imposed, and that such legislation, does not impair the obligations of contracts, within the meaning of the federal Constitution; and hence it is argued that, if such a change or alteration of the charter by legislative enactment is not forbidden, such legislation as was here attempted and such action as was here taken by the majority are likewise not forbidden. We are not disposed at this time, nor is it necessary, to question the correctness of such rulings. In principle, however, we perceive a marked distinction between the exercise of such power and the one here in question. Undoubtedly, if it were competent for the Legislature to create such an individual statutory liability it would be competent for it to create a mere stock liability for the future debts and obligations of the corporation. But the exercise of such a power pertains directly to the very franchise and immunity granted by the state, and directly relates to and affects the contract existing between the state and the corporation and its stockholders. Among others, one of the principal objects of persons forming private business corporations is to obtain and have granted to them an immunity from personal or individual liability for the debts and obligations resulting from the conduct of the business carried on by the corporation, and to avoid the personal and individual liabilities usually growing out of the relation of a mere partnership. Such an immunity is generally granted to members of most private business corporations and of some quasi public corporations. As the authorities say, this limited liability is a part of the corporate privilege conferred by the state, and the right to repeal the franchise itself includes the

right to to repeal any part of, or altogether, the franchise or privilege of limited or nonpersonal liabilty. The immunity of such liability to the corporators existed in the first instance only because the state had granted it to them, and what it has granted it may, under its reserved power, take away or modify. But the Legislature has not undertaken to repeal, modify, or alter any immunity or liability of any kind theretofore granted by it to the members of the defendant corporation. No new or different liability in such respect was created, either by the state or by the amendment attempted to be made by two-thirds of the stockholders. What the Legislature attempted to do was to confer the power upon two-thirds of the stockholders to amend the articles in any particular (restricted only so as not to create a personal or individual liabilty of the stockholders nor alter the alleged purposes of the corporation, nor diminish the capital stock below a certain amount), even to the extent of changing the very contract existing among the stockholders themselves and by which their reciprocal rights became vested and defined; and what two-thirds of the stockholders did by way of amendment was the making of such a change. What they did was not an alteration or modification of their relation to the state or the doing of something for its benefit, but was an attempt to compel contributions of additional capital to the corporation for the benefit of the corporation itself, and for mere corporate purposes. When the Legislature by law declares that corporators of existing corporations shall individually be liable to creditors for future debts, or their stock shall be liable therefor, or their liability shall be proportional to the extent of stock held by them, such legislation is something which does not affect some mere relation existing among the stockholders themselves, but directly affects their relation to the state, and directly relates to the immunity which the state itself had theretofore granted to the corporators. Such alteration creates a right in favor of creditors which could be enforced by them against the corporators. Of course, with such an alteration of the contract, and with such increased burdens imposed upon the corpora-

tors, they would not be compelled to continue the corporate existence, but they would have the right to dissolve the corporation and to have its assets distributed. Whether a majority of the stockholders could accept such an amendment or alteration, though it relates alone to the contract existing between the stockholders and the state, so as to bind a dissenting minority, we need not here consider. The authorities generally are to the effect that a majority of the stockholders are not authorized to accept a fundamental amendment of a charter and proceed, but unanimous consent of the stockholders is necessary. They somewhat differ as to what amendments are regarded as fundamental, and what merely governmental and administrative. But authorizing the levying of assessments to obtain involuntary contributions of additional capital merely for corporate benefit and purposes is something which only affects the relation of the stockholders among themselves, and alone affects their agreement with respect to contributions of capital to the corporation. Such an amendment, therefore, stands upon a different footing. The one, where a statutory liability for the future debts and obligations of the corporation is imposed upon the corporators, pertains to the contract existing between them and the state, which is within the power of the Legislature to alter or amend, and the other relates only to the contract existing among the corporators themselves, which the state may not materially alter or modify.

We have not been cited to any cases where the specific question before us was directly involved, except the cases of *Enterprise Ditch Co. v. Moffit,* 58 Neb. 642, 79 N. W. 560, 45 L. R. A. 647, 76 Am. St. Rep. 122, and *Gardner v. Hope Ins. Co.,* 9 R. I. 194, 11 Am. Rep. 238. In the Nebraska case, under a constitutional provision reserving to the state the right to alter from time to time and to repeal all laws relating to corporations, it was held that.

"The fully paid-up stock of a corporation is the personal property of the owner, and the articles of incorporation and laws of the state are elemental of the contract existing between the corporation and the owner of stock, and may not be so amended by Legislative enactment as to make the paid-up stock subject to an assessment or general

or specific assessments, and forfeitable, or subject to summary sale by the corporation, for the nonpayment of such assessment." To do so, the court says, "would involve too violent an invasion of property and contract rights."

This case is cited by Mr. Cook in his work on Corporations (5th Ed.), at section 497, where he approvingly states the rule, announced in that case, that "a statute which authorizes an additional assessment upon existing paid-up stock is unconstitutional." In the Rhode Island case the court seems to hold a contrary doctrine, though in that case it is not made to appear that the full-paid capital stock was made nonassessable by the original articles of incorporation, and in that respect the case may be distinguishable from the Nebraska case and the case at bar. But, conceding that the holding of the Rhode Island court is contrary to that of the Nebraska court, we think the latter is more in the line with the general principles of law as stated by the text-writers.

In the discussion of the question it has been said by counsel that the rule announced by the Nebraka court deprives the majority of the management of the corporate property and of the control of mere administrative policies, and prevents the Legislature from making needful legislation with respect thereto. We do not think so. The doctrine announced is no infringement of the exercise of such powers. Independently of the reserved power and of the legislative enactment a majority of a corporation may determine the management of the corporate property, administer the affairs of the corporation, and control the conduct of its business. The amendment was not essential to the proper exercise of such powers. When counsel for respondent in effect concede, as they do, that the action taken by the majority was unauthorized, but for the legislative enactment of 1903, they in effect concede that the action taken by such stockholders was something more than the exercise of mere administrative functions; and it is quite clear that the action so taken was not administrative. It was not confined to the management of the corporation, or of its property, or to the administration of its affairs; but it extended to the management of the private affairs and pro-

perty of the corporators. It amounted to a compulsion of contributions for corporate purposes, and to an invasion of the agreement which the stockholders had made among themselves that no further or additional contribution should be exacted beyond the full-paid capital stock, and a fundamental change of their contract in that respect. The amount of capital which the corporators were willing and had agreed to contribute and risk in the enterprise was fundamentally as important under their contract as was the stipulation with reference to the nature of the business to be carried on by the corporation. It cannot be said that changing the nature of the corporation or the character of its business is fundamental and cannot be accomplished without the consent of all the stockholders; but another and equally important stipulation in the articles of incorporation relating to the contributions of capital for corporate purposes to be exacted from the corporate members is nonessential and nonfundamental. It must be conceded that the full-paid capital stock became the private property of the stockholder. As between himself, the corporation, and his cocorporators, he paid the full consideration therefor, and paid all that was agreed by him to be paid. To now say that the Legislature, in face of such an agreement as was here made by the corporators, may authorize a majority to compel a dissenting minority to buy it over again, not only once, but as many times as they may, in good faith, determine, by the enforcement of additional contributions of capital for mere corporate purposes, and to make a sale of their stock, resulting in a forfeiture of all their rights and equities in and to the assets of the corporation, if the unwilling members do not see fit to yield to such compulsion, is conferring a power which gives to the majority the absolute dominion over the private property of the stockholders, permits a disturbance of vested rights, and the impairment of contract obligations, within the protection of the federal Constitution.

A further argument is made by counsel that if a corporation becomes indebted when it has no funds in its treasury to discharge the indebtedness, and if the levy of an assessment

such as was here attempted is not permissible, the whole of the corporate property may be sold on execution sale, and that by reason of such involuntary alienation the unwilling members, as well as all other members, are forced to part with all their holdings and equities. The argument points to matters of mere utility, not to the rights of the stockholders. Whether an execution sale of the corporate property in satisfaction of corporate debts may or may not produce a more serious result than enforcing contributions from the corporate members is beside the question. Every stockholder has a vested equity in and to the assets of the corporation. The value of his equity is dependent upon the value of corporate assets and the extent of corporate liabilities. Dependant upon such facts, the value of his equity may be much or little. But, whatever it may be, his right to participate in the distribution of the assets, when the corporate property has been sold on execution, is not disturbed, nor is he compelled to personally contribute to the payment of the corporate debts. So, if a corporation becomes insolvent, it may go into liquidation; but the individual members and stockholders are not bound to pay such indebtedness, except out of the assets. In such case a new corporation may be formed, by contribution of new capital, for the purpose of taking over the assets of the insolvent corporation and paying its debts. But it would be entirely optional with each member of the insolvent corporation whether he entered such new corporation. It can at once be seen that he cannot be compelled to do so against his will. Now, the members of the insolvent corporation could in effect accomplish the same result as could be accomplished by the formation of a new corporation and the contribution of new capital by making voluntary contributions of new capital to the insolvent corporation. But the dissenting corporators cannot, contrary to the agreement as here made by them, be forced to make such contributions against their will, any more than they can be forced against their will into a new corporation. When, therefore, a majority seek to compel additional contributions to a corporation for corporate purposes from a dissenting minority, when by the terms of their original agree-

ment such contributions cannot be exacted, they in effect seek to force them into a new corporation. This neither the Legislature nor a majority are authorized to do.

It may be true, as was suggested by counsel, that in many instances it may be wise and expedient for corporators to make additional contributions of capital to discharge corporate indebtedness, so as to preserve the corporate property, or to make such contributions for the successful conduct of the business. But that is something which the corporators should consider when they make their contracts. Courts are organized to enforce contracts as made, unless they contravene good morals or public policy. They cannot create new contracts, nor can they permit the parties themselves to do so without the consent of all, upon any theory that the original contract was not the most beneficial or advantageous, or that the enterprise contemplated by the terms of the contract cannot be successfully operated under it. By their solemn agreement the parties have here defined and limited their contributions of capital to the corporation for corporate purposes. Such a fundamental and material stipulation in their contract cannot be changed by the Legislature, nor can it confer power upon a majority of the stockholders to do so without violating the federal Constitution. No one contends that the individual members of a corporation are liable for, nor are they legally bound to assume or pay, the debts or obligations of the corporation. Until the Legislature shall by law declare that such a liability is imposed, which it has not yet done, it does not lie within the power of a majority to reach into the private pockets of a dissenting minority to compel such payments, and then seek to justify such action because a greater calamity may overtake them as a result of an execution sale.

The questions as to whether, under the enactment of 1903, two-thirds of the stockholders, or a majority, under the enactment of 1905, are legally empowered to authorize a levy of assessments on full-paid capital stock against a dissenting minority when the original articles place no prohibition on the levying of assessments, or contain no stipulation on the subject, or the extent that such stockholders of corporations

organized since the enactments are legally authorized to amend the articles so as to make such stock assessable, are not now before us. Confined to the question which is before us, we think the demurrer ought to have been overruled.

The judgment of the court below is therefore reversed, and the trial court directed to reinstate the case, to overrule the demurrer, to permit the defendant to answer, if it is so advised, and, pending the action, to restrain the defendant as prayed in the complaint. Costs to appellant.

McCARTY, C. J., and FRICK, J., concur.

## ON REHEARING.

FRICK, J. A rehearing is requested in this case upon substantially the following grounds: It is urged that the court erred in its interpretation of the constitutional provision in which the right to alter, amend, and repeal the laws affecting corporations is reserved by the state; that the decision is inconsistent, in that it in effect authorizes a change of the laws with respect to some of the contractual rights of a corporation, while it denies this right as to others; that the court erred in holding that the right to alter and amend the laws is limited to such matters only in which the state is interested; and, finally, that the court erred in holding that neither the state nor the public were interested in the amendment involved in this case.

Viewing the question from the standpoint of counsel, their argument in support of the petition for a rehearing is a learned and able exposition of that side of the question. We are not persuaded, however, that their conclusions are sound. It is urged that we are inconsistent in holding that under the reservation the state may alter or amend some of the provisions of a charter, but may not do so as to others. In our original opinion we endeavored to make clear that the charter forms the basis of a contract between the state and the corporation, as well as a contract between the corporation and the stockhold-

ers. We held that the Legislature, under the reservation, may alter or amend the contract with reference to the state and in which it is interested, but that it may not make a material or fundamental change of the contract which alone concerns the corporation and its members. Upon these premises we reached the conclusion that the attempted legislation, and the action taken by the majority of the stockholders in pursuance thereof, did not fall within the reservation. In so holding we see no inconsistency. What counsel in effect do is not pointing out any inconsistency, but are disputing the premises upon which we reached the conclusion; that is, counsel still assert that the reservation in the Constitution is so broad and illimitable that all the provisions of a charter may be altered or amended by the Legislature, regardless of their character, and whether they concern the state or merely the agreement between the corporation and its members. Among the many cases cited, and many others examined by us, we do not find any of them giving the reservation such a construction. If any one thing pertinent to the question under consideration is well settled by the authorities it is that the power which may be exercised under the reservation is not without limit, and that there is a strong tendency in the decisions to limit the power of the Legislature to amend the charter under the reservation. We fully appreciate the difficulty in defining the extent of such power, and, while we are well aware of the conflict among the authorities in so doing, yet none of them support the contention of counsel that the extent of the power is unlimited, in the sense and to the degree contended for by them. We think the rule stated by us is supported by the great weight of authority and is founded upon well-established legal principles.

Because of counsel's deductions, we are, however, induced to enlarge somewhat upon what is said in the original opinion. We do this, not because the matter was not covered in the original opinion, but because it was not deemed necessary to fully discuss all the reasons that impelled us to the conclusion reached. The matter we shall discuss is touched upon at page 15 of the typewritten copy of the opinion (91 Pac.

374), and we shall limit ourselves to a further elucidation of the matter there touched upon. In this connection it is quite true, as counsel contend, that all of the matters that must be set forth in the articles of incorporation, as found in section 315, Rev. St. 1898, as amended by Laws Utah 1905, p. 18, c. 22, are contractual. From this counsel infer that, if it be conceded that the state may alter and amend one provision, it logically follows that it may do so, or authorize such to be done, with respect to all provisions found in the articles; the conclusion being that one provision is no more sacred than another, and, if one must yield to the reserved power, all must do so. The argument is, however, more plausible than sound; and the force of the argument is greatly weakened by the fact that both the text-writers and the courts, including the Supreme Court of the United States, clearly recognize a limitation upon the right of the state to alter and amend the laws affecting existing charters, or to authorize such alterations or amendments by the stockholders without the consent of all that are affected thereby. This is aptly stated in the case of *Miller v. State,* 15 Wall. 498, 21 L. Ed. 98, and in *Looker v. Maynard,* 179 U. S. 52, 21 Sup. Ct. 21, 45 L. Ed. 79. It is of the utmost importance in this connection to keep in mind the fact that this limitation is not merely to prevent the confiscation of property, or to affect or destroy vested rights without due process of law (as these matters are controlled by other constitutional provisions), but the limitation is expressly based upon the narrower ground, namely, the impairment of contractual rights and obligations. As the United States Supreme Court is the ultimate authority upon the question as to when such rights are invaded, we need not again refer to the state courts or the books of the text-writers. We thus see at a glance that the broad conclusion that, since one matter that inheres in contract may be altered, therefore all may be, is not tenable. There, of course, must be some reason for this distinction. Mr. Justice Straup gave what to us seemed an adequate reason. This, however, is attacked as being liable to misconception, because the line of demarcation is not defined when

the alteration of a contractual matter is or is not within the reserved power. By a thorough examination of the authorities and the reasons advanced by the courts we were forced to the conclusion that, while the precise point of demarcation when an amendment of the charter comes within or falls without the reserved right of the state is not well defined by the authorities, this case, nevertheless, is one that clearly falls within the class that is outside of the reserved power.

In the original opinion the statutory provisions governing assessments on fully paid up corporate stock are set forth at large. From those provisions it is obvious that unless the stock is made assessable by the articles, or agreement, as it is sometimes called, of incorporation, then it is immune against any assessments. In order, therefore, to levy an assessment, the incorporators, or stockholders, must agree upon this matter specially, since to remain silent is to forbid assessments. If we now examine section 315, supra, we find that that section defines what the incorporators must agree upon and set forth in the articles of incorporation in order to obtain a grant of a corporate franchise from the state. These matters are grouped under eleven heads in the section and comprise the essentials required to obtain a franchise. But there is also subdivision 12 in that section, by the provisions of which the incorporators are permitted to agree upon and insert in the articles any other matter or matters that they may deem necessary or expedient to further the business or enterprise for which the corporation is formed. But these latter provisions are not essential to the grant, and both the right to the franchise from the state and the grant itself are complete without them. The state, therefore, relegates these matters entirely to the judgment and wishes of the incorporators. They may or may not enter into an agreement respecting them, but as to all other matters contained in section 315 the incorporators must agree, and the state bases its grant upon the latter. From this it is only fair to deduce that the state has no interest in these special agreements, but permits them to be made a part of the articles of incorporation as a matter affecting the stockholders only. In this special agreement

the stockholders, no doubt, may agree among themselves respecting the conditions upon which the stock shall be issued to and held by them, to the extent, at least, that such an agreement is not in contravention of law. May they not also agree that the stock, issued and paid for in full, shall be entirely free from all subsequent assessments and forfeitures, and to that end may they not, by such an agreement, impose limitations upon the corporation itself? What interest has the state in such an agreement, and in what way does it come within its reserved power? If we concede that the right to issue the stock is an incident to the corporate franchise, and hence within both the law and the grant of the state, still it does not follow, after the condition is agreed to and the stock is issued, that the state may change or affect the condition itself, or authorize this to be done. If we assume that the corporation had entered into an agreement with the subscribers or purchasers of its stock, when they subscribed for or purchased the stock, that if they would pay the par value therefor the stock should be and remain free from all assessments or claims against it, and to that end the corporation had inserted a clause in the articles of incorporation exempting fully paid-up stock from all assessments, could this agreement be changed, so as to place any additional burdens upon the stock, without the consent of the subscribers or purchasers?

No one would contend, we think, that this could be done after the subscription or sale agreement had been entered into and before the stock was paid for, so as to add anything to the price agreed upon; and this, we think, would be conceded, although both the law and articles of incorporation had been changed and amended after the agreement was entered into and before the stock was paid for. If this could not be done to the prejudice of the subscribers or purchasers, it must be upon the ground that to do so would impair contractual rights and obligations, in that it would impose conditions contracted against in the subscription or purchase agreement. In what way does the contract above instanced differ from one where the incorporators or stockholders agree

among themselves (and make the agreement a part of the articles of incorporation) that the stock shall be issued and paid for upon the condition that it shall be and remain free from assessments and forfeiture? Does not the corporation become a party to this agreement by accepting the charter and by acting under it? And does not the state suspend its right to change it without the consent of all, by authorizing such a contract to be entered into as a matter wholly apart from its governmental supervision over corporations? The state has, in effect, announced to the incorporators or stockholders that, so far as the assessment of corporate stock is concerned, that matter is left entirely with them, to agree upon as they may deem best; that it is not a matter in which the state is concerned. If the instance first mentioned constitutes a condition created by contract which may not be affected, why is not the second precisely the same in principle? In the second instance we have no more than a contractual condition upon which the stockholder relied in subscribing for or purchasing the stock, and which, we think, the state and the corporation are bound to respect. If the stockholders in the original articles had agreed that they might be changed or amended generally, the case would, no doubt, be different, as pointed out in the case of *Nelson v. Keith-O'Brien Co.,* 91 Pac. 30, for the reason that the stockholders thereby consented to amendments of the articles constituting the entire agreement under which the stock was issued to them. But this is not such a case. Here we have an express agreement that the stock is issued and received upon the condition that it shall not be subject to assessment, and therefore be immune against a forced sale or forfeiture. Is it an answer to say that, the reserved power of the state being general, therefore it applies to all changes of every kind and nature that may affect the powers, rights and privileges of the corporation and of the stockholders with regard to their relations with one another? The law no doubt can be changed with regard to all these matters; but it does not follow that it may be done so as to affect past transactions or vested rights.

As we have attempted to show, the stock was issued by the respondent upon an express condition whereby its rights were limited by the incorporators in a matter which the state did not deem essential to the grant of a corporate franchise and upon which the state permitted the stockholders to agree among themselves. We think, therefore, that in such a case the corporation ought not to be permitted to violate the agreement upon the sole ground that the state has reserved the right to alter and amend all laws relating to corporations. The condition in question is purely voluntary on the part of the incorporators, as contradistinguished from all other provisions in the articles which are made necessary and compulsory. The state simply authorized the incorporators or stockholders to enter into any agreement they saw fit with regard to assessments. Having authorized this to be done unconditionally, the state has suspended its right to affect the agreement entered into by virtue of its authority. This conclusion, we think, is well supported by the case of *Detroit v. Detroit Citizens' St. Ry. Co.*, 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, as that case is interpreted by Mr. Justice Sanborn in *Omaha Water Co. v. City of Omaha*, 147 Fed. 11, 77 C. C. A. 267. In the latter case the state authorized a municipal corporation to enter into certain contracts. After the contracts had been entered into, the city attempted to modify some of the provisions, under the claim that the state had authorized this to be done by subsequent legislation, and that, under this legislation, the modifications were proper, in view of the reserved power of the state to amend the laws in relation to corporations. The court held that, inasmuch as the state had unconditionally authorized the contract, the state could not authorize a modification thereof without the consent of all the interested parties. In what way do the principles involved in that case differ from the one at bar? The state certainly did authorize the stockholders to enter into an agreement among themselves in a matter in which the state disclaimed any governmental interest, by reason of the fact that it relegated the whole matter to the parties themselves, and would have granted them a

charter with or without the agreement. The state, therefore. was indifferent in respect to what the agreement was, but authorized any conditions to be made upon which the stock might be issued and held. This being so, and the matter being outside of governmental regulation, why should the state be permitted to interfere or be permitted to authorize this to be done? We think, therefore, that the corporation is bound, and that all the stockholders are likewise bound, to the extent that any number less than the whole may not amend the articles of incorporation so as to avoid the condition upon which the stock of the appellants was issued.

Neither is it important here that there are other matters contained in the laws affecting the corporation and stockholders that are not contained in the articles of incorporation which from time to time may be amended and which may fall within the reserved power of the state. A complete answer to this is that the state has not specially relegated these matters to the incorporators to agree upon as they deem best. With regard to all these the state simply provided rules or regulations in the form of laws, all of which were subject to change at any time, and they thus were not, nor intended to be, matters inhering in special contracts. But, apart from this, in what way is the state, as such, interested in private contracts, whether made between incorporators or between anybody else? True, the people of the state are interested in having the resources of the state developed, and the state has an interest in promulgating wholesome laws and in having them enforced; but whether money is obtained by one method or another, either to start a new enterprise or continue one already launched, the state has no interest whatever. Neither is it interested in whether a private corporation discharges its obligations with money obtained through assessments of corporate stock or by the sale of its property. Indeed, if the laws of this state are any indication of its policy, then it has manifested that policy in declaring that corporate stock is not assessable, unless made so by the stockholders themselves. True, the state may authorize a certain number of the stockholders to do this as it applies to future charters;

but it cannot, after unconditionally authorizing a contract granting the right to hold stock unconditionally, impose limitations upon that right by changing the contract, or authorizing it to be done, without the consent of all the stockholders. Such a contract, being wholly outside of the conditions and agreements required to obtain a corporate franchise, cannot be said to fall within the reserved power of the state to alter and amend the laws governing corporations.

In conclusion, we desire to state that, while the questions involved, in and of themselves, are of great importance to both the state and the citizen, the utility involved in settling them is of still greater importance. Both sides have, with much diligence and earnestness, fully presented all that can profitably be said upon either theory, and they have thus rendered us much assistance in determining the questions. The duty to adopt one or the other theory devolved upon us alone. We have adopted that which, in our judgment, seemed the most just and reasonable under all the circumstances, and in view of the state of the law upon the subject as we understand it. We feel thoroughly convinced that the conclusion reached is correct, and, entertaining this view, it could subserve no practical purpose to grant a rehearing of the case.

The application, therefore, should be, and accordingly is, denied.

McCARTY, C. J., and STRAUP, J., concur.