GEDDES et al. v. ANACONDA COPPER MINING CO. et al.

(Circuit Court of Appeals, Ninth Circuit. October 1, 1917.)

No. 2831.

1. MONOPOLIES ⊂⊃23—COMBINATIONS IN RESTRAINT OF TRADE—PERSONS ENTI-
TLED TO QUESTION—MINORITY STOCKHOLDERS.

Minority shareholders of a corporation, which owned property valuable
for copper mining, cannot, the property having been sold to defendant, at-
tack the sale on the ground that defendant company was acquiring mines
with the intention of securing a monopoly of the copper industry, in viola-
tion of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209, for the
act created a new offense, and cast upon designated officers the duty of
enforcing its provisions.

2. CORPORATIONS ⊂⊃519(3)—TRANSFER OF PROPERTY—INADEQUACY OF CON-
SIDERATION.

In a suit by minority shareholders to set aside a conveyance of the en-
tire corporate property, evidence held to sustain a finding that the con-
sideration was inadequate.

3. CORPORATIONS ⊂⊃404(1)—POWERS OF DIRECTORS—STOCKHOLDERS.

That stockholders, whose stock was nonassessable, were of ample means
to pay assessments, does not deprive the directors of power to dispose of
corporate property, on the theory that assessments necessary to carry on
the business could not be levied.

4. CORPORATIONS ⊂⊃404(1)—DIRECTORS—POWERS OF.

At common law the board of directors of a private corporation could
sell or otherwise dispose of the corporate property, subject to the limita-
tion that it could not sell or dispose of the entire property.

5. CORPORATIONS ⊂⊃404(1)—DIRECTORS—POWERS.

A Utah mining company, whose charter authorized it to buy, sell, lease,
hold, and operate mining claims, and to buy, lease, and exchange ores,
etc., and do all kinds of business incident to the management of a general
mining business exhausted the profitable silver ore in its mine. The treas-
ury was depleted, the corporation was indebted, and the stock was non-
assessable. A Utah act of 1905 (Comp. Laws 1907, § 322), declares that
any corporation now existing or hereafter organized for the purpose of
mining may purchase, lease, or otherwise acquire mining property, and,
in case the articles of incorporation do not provide for the sale or other
disposition of the property of the corporation, their disposition by the
board of directors shall not be valid or binding upon the corporation until
confirmed by the majority in amount of the stock outstanding, at a meet-
ing of the stockholders called to consider the action of the board, but that,
when the articles of incorporation authorize the sale of corporate property
by the directors or stockholders, sales made in accordance therewith shall
be binding upon the corporation. Held that, though all of the property
of a private corporation cannot be disposed of, unless authorized by stat-
ute or charter, or unless the stockholders unanimously consent, or unless
disposition by the directors is necessary because the corporation is in
failing circumstances or insolvent, etc., the directors of the Utah mining
company were authorized to dispose of its entire property with consent of
a majority of the stockholders, though the corporation's property was
worth far more than its debts.

6. CORPORATIONS ⊂⊃603—SALES—EFFECT.

A sale of all of the property of a corporation does not necessarily ter-
minate its corporate existence, for corporations may exist without prop-
erty.

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. MINES AND MINERALS ☞105(2)—SALE OF CORPORATE PROPERTY—POWERS OF DIRECTORS.

Under Comp. Laws Utah 1876, p. 232, subsequently made Const. Utah, art. 12, § 1, which authorized the amendment, alteration, or repeal of the statute under which a mining company was incorporated, the directors of a mining company are, under the act of 1905 (Comp. Laws 1907, § 322), enacted after incorporation, entitled to dispose of the entire corporate property with the consent of a majority of the shareholders; the by-laws of the company as originally organized providing for the acquisition and disposition of mining property.

8. CORPORATIONS ☞318—SALE OF CORPORATE PROPERTY—CONTRACTS.

Contracts between corporations having common directors, while not prohibited, are voidable; and the burden rests on those seeking to sustain them to show clearly that they were entirely fair and free from wrong.

9. CORPORATIONS ☞519(3)—CONTRACTS—EVIDENCE—ACTIONS.

In a suit by minority stockholders to set aside a contract whereby the entire property of a mining company was sold to defendant, where the president of the mining company was a director of defendant, evidence *held* insufficient to clearly show that the contract was entirely fair and free from wrong.

10. CORPORATIONS ☞610(2)—DISSOLUTION—RIGHTS OF MINORITY SHAREHOLDERS.

Where authorized by statute, a minority of the shareholders cannot prevent dissolution in accord with the will of the majority.

11. CORPORATIONS ☞318—SALE OF CORPORATE PROPERTY—EFFECT OF SALE.

Minority shareholders cannot complain of the sale of corporate property to defendant corporation, in which the majority shareholders were interested, where defendant offered the highest bid; the minority shareholders being only entitled to have the property sold free from any unfair combination on the part of the majority stockholders and defendant.

12. CORPORATIONS ☞318—SALES—VACATION.

Where a sale of all the property of the corporation, which could sell without unanimous consent of its stockholders, to another corporation, which had common directors, was for an inadequate price, the sale will not be unconditionally set aside; but a public resale will be ordered, the property to be struck off to the highest bidder if thereby a greater amount should be realized, but otherwise the sale to remain undisturbed, for a majority of the shareholders, who consented to the sale, are in that event entitled to be protected.

Ross, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the District of Montana; Geo. M. Bourquin, Judge.

Suit by Peter Geddes and others against the Anaconda Copper Mining Company and others. From the decree denying part of the relief sought (222 Fed. 129), complainants appeal. Affirmed.

Walsh & Nolan and T. J. Walsh, all of Helena, Mont., for appellants.

L. O. Evans, of Butte, Mont., W. B. Rodgers, of Anaconda, Mont., and D. Gay Stivers, of Butte, Mont., for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. This suit was brought by certain minority stockholders of the appellee Alice Gold & Silver Mining Company,

a corporation organized in 1881 under the laws of the then territory of Utah, to procure a decree annulling a deed of all of its property to the appellee Anaconda Copper Mining Company, a corporation, made in consideration of a transfer of 30,000 shares of the capital stock of the latter company to the Alice Company—the grounds upon which the relief is sought being, first, that neither the board of directors nor a majority of the stockholders of the Alice Company was authorized to sell or dispose of all of its property against the protest of any of its stockholders; second, that the Alice Company had no authority to acquire the stock of the Anaconda Copper Mining Company; third, that the parties who negotiated and carried out the sale and the parties who negotiated and carried out the purchase were substantially the same, all being controlled by John D. Ryan, who was at the time a director of both companies and the president of the Alice Company, and that the consideration upon which the transaction was based was inadequate; fourth, that the purpose with which the purchase was made was to monopolize the production of copper in the Butte district of Montana, where the property is situate, and the sale of the same in the markets of the world, in violation of the federal Anti-Trust Act known as the Sherman Act.

[1] While the last point mentioned has been very ably and elaborately argued by counsel on both sides, we find it unnecessary to consider it, for the reason that, as we understand the recent decision of the Supreme Court in the case of Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U. S. 165, 35 Sup. Ct. 398, 59 L. Ed. 520, Ann. Cas. 1916A, 118, it is not available to the appellants. That case involved the construction of the Anti-Trust Act and the effect of a profit-sharing contract of the Refining Company and those dealing with it exclusively, and the right of that corporation to recover for goods sold by it to the Manufacturing Company. The court, in denying the defense interposed by the purchaser, based upon the claim that the Refining Company had no legal existence, as it was a combination composed of all the manufacturers of glucose or corn syrup in the United States, illegally organized with the object of monopolizing all dealings in such products, in violation of the Anti-Trust Act of Congress, and had further sought to perpetuate its monopoly by devising a certain profit-sharing scheme, based its ruling upon two grounds, the second of which is as follows:

"In the second place, the proposition is repugnant to the Anti-Trust Act. Beyond question re-expressing what was ancient or existing, and embodying that which it was deemed wise to newly enact, the Anti-Trust Act was intended in the most comprehensive way to provide against combinations or conspiracies in restraint of trade or commerce, the monopolization of trade or commerce, or attempts to monopolize the same. Standard Oil Co. v. United States, 221 U. S. 1 [31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734]; United States v. American Tobacco Co., 221 U. S. 106 [31 Sup. Ct. 632, 55 L. Ed. 663]. In other words, founded upon broad conceptions of public policy, the prohibitions of the statute were enacted to prevent, not the mere injury to an individual which would arise from the doing of the prohibited acts, but the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented; and hence not only the prohibitions of the statute, but the remedies which it provided, were coextensive with such conceptions. Thus the statute expressly cast upon the Attorney

General of the United States the responsibility of enforcing its provisions, making it the duty of the district attorneys of the United States in their respective districts, under his authority and direction, to act concerning any violations of the law. And in addition, evidently contemplating that the official unity of initiative which was thus created to give effect to the statute required a like unity of judicial authority, the statute in express terms vested the Circuit Court of the United States with 'jurisdiction to prevent and restrain violations of this act,' and besides expressly conferred the amplest discretion in such courts to join such parties as might be deemed necessary and to exert such remedies as would fully accomplish the purposes intended. Act July 2, 1890, c. 647, 26 Stat. 209. It is true that there are no words of express exclusion of the right of individuals to act in the enforcement of the statute, or of courts generally to entertain complaints on that subject. But it is evident that such exclusion must be implied for a twofold reason: First, because of the familiar doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.' Farmers' & Mechanics' National Bank v. Dearing, 91 U. S. 29, 35 [23 L. Ed. 196]; Barnet v. National Bank, 98 U. S. 555 [25 L. Ed. 212]; Oates v. National Bank, 100 U. S. 239; Stephens v. Monongahela Bank, 111 U. S. 197 [4 Sup. Ct. 336, 28 L. Ed. 399]; Tenn. Coal Co. v. George, 233 U. S. 354, 359 [34 Sup. Ct. 587, 58 L. Ed. 997, L. R. A. 1916D, 685]. Second, because of the destruction of the powers conferred by the statute and the frustration of the remedies which it creates, which would obviously result from admitting the right of an individual as a means of defense to a suit brought against him on his individual and otherwise inherently legal contract to assert that the corporation or combination suing had no legal existence, in contemplation of the Anti-Trust Act. This is apparent, since the power given by the statute to the Attorney General is inconsistent with the existence of the right of an individual to independently act, since the purpose of the statute was, where a combination or organization was found to be illegally existing, to put an end to such illegal existence for all purposes and thus protect the whole public—an object incompatible with the thought that such a corporation should be treated as legally existing for the purpose of parting with its property by means of a contract of sale, and yet be held to be civilly dead for the purpose of recovering the price of such sale, and then, by a failure to provide against its future exertion of power, be recognized as virtually resurrected and in possession of authority to violate the law. And in a twofold sense these considerations so clearly demonstrate the conflict between the statute and the right now asserted under it as to render it unnecessary to pursue that subject further. In the first place, because they show in addition how completely the right claimed would defeat the jurisdiction conferred by the statute on the courts of the United States—a jurisdiction evidently given, as we have seen, for the purpose of making the relief to be afforded by a finding of illegal existence as broad as would be the necessities resulting from such finding. In the second place, because the possibility of the wrong to be brought about by allowing the property to be obtained under a contract of sale without enforcing the duty to pay for it, not upon the ground of the illegality of the contract of sale but of the illegal organization of the seller, additionally points to the causes which may have operated to confine the right to question the legal existence of a corporation or combination to public authority sanctioned by the sense of public responsibility, and not to leave it to individual action prompted it may be by purely selfish motives. As from these considerations it results, not only that there is no support afforded to the proposition that the Anti-Trust Act authorizes the direct or indirect suggestion of the illegal existence of a corporation as a means of defense to a suit brought by such corporation on an otherwise inherently legal and enforceable contract, but, on the contrary, that the provisions of the act add cogency to the principles of general law on the subject, and therefore make more imperative the duty, not directly or indirectly to permit such a defense to a suit to enforce such a contract, we put that subject out of view and come to the only remaining inquiry, the alleged effect of the previous ruling in the Continental Wall Paper Case [212 U. S. 227, 29 Sup. Ct. 280, 53 L. Ed. 486], supra."

So far as the point above alluded to is concerned, the only difference between the case cited and this is that in that case a private corporation undertook to avoid the payment of money due from it under a contract with another private corporation on the ground that the latter was an illegal monopoly, and therefore had not the power to make the contract because of the Anti-Trust Act, while here the contention is that the Copper Company was without power to make a certain purchase from another private corporation because of the same act—which is, in principle, as we conceive, no difference at all.

The articles of incorporation of the Alice Company define its powers as follows:

"The business and pursuit of the corporation shall be to buy, sell, lease, hold, own, and operate mines, mining claims, mills, mill sites, furnaces and reduction and refining works, to buy, sell, and exchange mineral ores and bullion; to buy, lease, construct, and operate roads, tramways, and freight and transportation routes; to facilitate the business of the company; to appropriate, buy, and sell water, water rights, and ways for conducting the same; and generally to do all kinds of business incident to, connected with, or convenient for the management of a general mining business, in the territories of Utah, Montana, Idaho, and in any state or territory of the United States."

The record shows that the property consisted of about 140 acres of mining ground on the hill north of the city of Butte, and is contiguous to some of the properties of the Anaconda Company; that through it runs for more than three-quarters of a mile a great silver-bearing lode called the Rainbow lode, carrying some gold, upon which lode the company commenced work about 1881, sinking a shaft 1,500 feet, and running drifts of the aggregate length of about 10 miles, and from which lode it extracted a large amount of ore, out of which it paid its stockholders, commencing March 15, 1881, and ending April 27, 1898, $1,075,000—there having, however, been no dividends paid between November 23, 1891, and December 31, 1896. While that work, according to the evidence, disclosed very large bodies of zinc-lead ore, it left available no more silver ore. The zinc-lead ore being peculiarly refractory, and there not being then, nor yet, according to the evidence, any known process by which it could be worked at a profit, and the silver ore being the only kind in the mine then, or yet, according to the evidence, known that could or can be worked at a profit, work upon the mine by the company was suspended prior to 1894. From time to time thereafter it was worked in a small way under leases—the company receiving a royalty on such ore as the lessees were able to work. Water was allowed to rise in the mine, first to the 100, and afterwards to the 700, foot level, when, about 1899, the mill, which was upon one of the claims, was closed, and the company ceased operations. In 1902 the shaft house burned, but the company erected a new hoist, by which the lessees, also called in the record "tributors," could hoist the ore they desired to take out. While the leases were in operation, the royalties received by the company were insufficient to meet its necessary expenditures for insurance, taxes, and watching the property, and also proving unprofitable to the lessees, the leases were abandoned, and all work ceased. The indebtedness of the company, of course, gradually increased, and at the time of the sale in question amounted

to $34,101.56, of which $19,575.23 was incurred in the construction of the new hoist to take the place of the one destroyed by fire. At one time during the period that the property was dormant the stock of the Alice Company—incorporated with 400,000 shares, of the par value of $25 each—sold as low as 12 cents a share, and for years was depressed to a very low point. But in 1905 John D. Ryan secured from the holders thereof an option on a majority of the stock at $1.50 a share, being on the basis of $600,000 for the whole property, and in February of the same year made the purchase pursuant to the option.

These further facts, appearing in the record and succinctly stated by counsel, should be mentioned: Prior to the year 1899 a number of independent companies were engaged in mining and smelting copper ore in and near Butte, among them the appellee Anaconda Copper Mining Company, the Washoe Copper Company, the Parrot Silver & Copper Mining Company, the Colorado Mining & Smelting Company, the Boston & Montana Consolidated Copper & Silver Mining Company, and the Butte & Boston Consolidated Mining Company, all of which were large producers of that metal. In the year mentioned the Amalgamated Copper Company was organized as a holding company, with a capital stock of $75,000,000, and it acquired a majority of the stock of the Anaconda and Parrot Companies, and all of the stock of the Washoe and the Colorado Companies, and by 1901 it had acquired a majority of the stock of the Boston & Montana and of the Butte & Boston Companies, increasing its capital stock to make these latter purchases from $75,000,000 to $155,000,000—leaving of the then large copper producing companies in the Butte field only those controlled by F. Augustus Heinze and those owned by W. A. Clark.

At the time of the formation of the Amalgamated Company there was in progress between Heinze and his companies on the one side, and the Boston & Montana and the Butte & Boston on the other, much bitter and costly litigation, which, as soon as the last-named companies became allied with the Amalgamated, involved the latter and all of its constituent companies. In 1905 and 1906 negotiations were entered into between Ryan, the president of the Anaconda and a director of the Amalgamated Company, and Thomas F. Cole, on the one side, and Heinze, on the other, for the settlement of all of the litigation and adverse claims referred to, which negotiations resulted in a final settlement by which Heinze was paid $10,500,000 in cash, in consideration of which all of the properties with which he was associated at Butte were transferred to a corporation organized by Ryan and his associates to take them over, known as the Red Metal Mining Company, all of the stock of which (having a par value of $11,000,000) was immediately acquired by another corporation organized by the same interests to hold it, with a capital stock of $15,000,000, called the Butte Coalition Company, consisting of 1,000,000 shares.

It was while these negotiations were going on that Ryan acquired, under the option that has been mentioned, a majority of the stock of the Alice Gold & Silver Mining Company, which he subsequently turned over to the Butte Coalition Company. Of the Red Metal Company, Thomas F. Cole was president, W. O. Thornton was vice-president, and J. C. Lalor, C. D. Fraser, and James O'Grady were also directors.

Of the Butte Coalition Company, Cole was president, Ryan vice-president, and Urban H. Broughton, James Hoatson, Chester Congdon, B. B. Thayer, F. L. Ames, William B. Dickson, and A. C. Carson also directors; Thayer also being then president of the Amalgamated Company.

About the same time Ryan and his associates also acquired for the same interests all of the properties of Clark, except his Poser and Elm Orlu claims, which latter two claims were located on the Rainbow lode, and not far from the properties of the Alice Company, from both of which claims more or less copper ore has been shipped. The record also shows that a considerable quantity of copper ore has been found in a property at the easterly end of the Rainbow lode, owned by the Butte-Superior Company, which lode had, until these and perhaps other recent discoveries, always been regarded in the Butte district as a silver-bearing lode only.

Very naturally, the discovery of copper ore in commercial quantities in portions of the Rainbow lode is a reasonable basis for at least hope, and, possibly, of just expectations, that like ore may be found upon further exploration in the extensive properties on the same lode of the Alice Company—especially when the various other veins that the evidence shows exist on those properties and cross its portions of the Rainbow lode are considered, together with the known extent and huge production of copper ore in the district. At all events, that prospect, as shown by the record, entered into the estimates of the value of the Alice properties made by the experts on behalf of the appellants; they testifying that the finding of copper ore therein is a geological probability, which probability, as well as their estimates as to values, however, differed very widely from those fixed by similar witnesses of the appellees, who characterized the chance of finding copper ore in the properties of the Alice Company as a geological possibility—the value of the properties, according to the estimates of the former, being from $3,000,000 to $5,000,000; whereas, according to the opinions of the witnesses on behalf of the appellees, they brought by the sale all that they were at the time worth.

[2] The 30,000 shares of the stock of the Anaconda Copper Mining Company, for which the properties of the Alice Company were sold by its board of directors, are claimed by the appellees to have been worth at the time $1,500,000, and are conceded by the appellants to have been then worth $1,250,000, while their then value was found by the court below to have been $1,500,000 plus the amount of the indebtedness of the Alice Company, the aggregate amount of which consideration the court further found was inadequate. With that finding we are of the opinion that, upon the record, we would not be justified in interfering. Taking such to be the fact, we are therefore to consider and determine whether the judgment appealed from can be sustained—which judgment adjudged and decreed the sale in question in all respects valid and binding, and the title to all of the properties of the Alice Company to have passed thereby to the Anaconda Copper Mining Company; there having been shown to the court to have been no bidder at the offer of all of the said properties at a public sale upon

notice published in accordance with a preceding interlocutory decree of the court.

[3-5] We are unable to agree to the contention on the part of the appellants that the properties of the Alice Company, in the condition they were at the time of the sale, and for years theretofore had been, could not be legally sold and conveyed by the directors of the company without the consent of all of its stockholders. We quite agree that the company cannot be regarded as then insolvent, for it owed but $34,101.56, payment of which, so far as appears, was not even being asked, much less urged (by the Butte Coalition Company, which it appears was the creditor), and owned properties for which the Anaconda Copper Mining Company was willing to pay the equivalent of over $1,500,000. At the same time, all of the ores the properties were known to contain that could be worked at a profit had been extracted and disposed of many years before, and the development of other ore therein of commercial value, should such exist, necessarily involved the risking of a large amount of money. The Anaconda Company, no doubt, could afford to take that risk—especially as the evidence shows that the exploration and development of the Alice properties could be made from the workings of some of its own properties—and it is reasonable to suppose that it had sufficient information to justify it in undertaking to do so. But the Alice Company, not only had no money with which to make such explorations and development, but was in debt, which indebtedness was necessarily gradually increasing. Its stock was nonassessable, and therefore its stockholders could not be made to furnish the money essential to any further exploration of its properties. In the course of his testimony, Ryan, the president of the company, said, among other things:

"There had been no operations on the Alice properties excepting leases since 1893. After the Butte Coalition Company acquired control of the stock, there was no change in the operations. The leases were carried on much the same as they had been theretofore; no direct company operation, except taking care of the property. We could not undertake to carry on any mining operations on the property. We had no money. The company was in debt when we took it over, and we had never seen any way of liquidating that debt. It was a nonassessable stock. We could not call on the shareholders for money, and we had no way of carrying on operations. We discussed the matter of borrowing money, offering bonds to the shareholders; but, in looking into the affairs, we could not see where we were justified to ask them for any money. The mine had been worked to a depth of about 1,500 feet, and, even with silver above $1 an ounce, had closed down. No one had ever been able to find a process that would make the zinc ore in the mine commercial, and there has never been known to be any copper in the mine, so we did not see what representations we could make to the shareholders to induce them to put up money to carry on operations."

The fact that the Butte Coalition Company owned 234,000 of the 400,000 shares into which the capital stock of the Alice Company was divided, which 234,000 shares were acquired by the former company from Ryan, and that he acquired them in large part from men also of large means, and that either or all of such owners might themselves have furnished or secured the money necessary for the further development of the properties, is, in our opinion, wholly unimportant. Conceding their ability to have done so, they were not obliged by any rule

of law or equity to do it. The circumstances under which private corporations may sell and dispose by absolute conveyance of all of their property are thus stated in Thompson on Corporations (2d Ed.) § 2429:

"First. Private corporations, when expressly authorized by statute, charter, or by-laws, may sell and dispose of all the corporate property.

"Second. Private corporations, by the unanimous consent of all stockholders, in the absence of express prohibition, may sell and dispose of all corporate property.

"Third. The directors and managing officers have the power to dispose of all the property, where the governing statute provides that private corporations may sell their entire property.

"Fourth. Where the corporation is in failing circumstances, or is in fact insolvent, the directors and managing officers may dispose of all the property, or make an assignment of all the corporate property for the benefit of creditors.

"Fifth. The majority stockholders may alienate all the corporate property, when expressly authorized by statute, charter, or by-laws.

"Sixth. The majority stockholders, even as against the protest of the minority, may dispose of all the property when the corporate business has become unprofitable, and where it would be ruinous to the corporation and the stockholders to continue the business, or where there are insufficient funds to continue the business and no money with which to pay existing indebtedness, or when the corporation is in failing circumstances, or is in fact insolvent."

The purposes and powers of the Alice Company, as expressly stated in its articles of incorporation, have already been set out. By a statute of Utah enacted in 1905, after conferring certain powers on the corporations of the state, it is further provided:

"And any corporation now existing, or that hereafter may be organized under the laws of this state for the purpose of mining, or the exploration or development of mining property, including lands bearing metal, stones, limestone, oil, petroleum, asphalt, and other hydro-carbons, shall, in addition to the powers above enumerated, have the power to purchase, take on bond, or lease or in exchange, or locate, or otherwise acquire, any lands, mines, options, territory, fields, or claims, and to sell, convey, lease, bond, mortgage, dispose of, or otherwise deal in the same to such extent as the board of directors may deem prudent, subject always to the provisions of the articles of incorporation and by-laws: Provided, that in case the articles of incorporation do not provide for the sale or other disposition of the property of the corporation, then the act of the board of directors shall not be valid or binding on the corporation until confirmed by a vote of the majority in amount of the stock outstanding, at a meeting of the stockholders duly called to consider such action of the board. When the articles of association provide that the property of the corporation may be sold, mortgaged, or otherwise disposed of by the directors or by the stockholders, sales made in accordance therewith shall be binding on the company." Section 322, Compiled Statutes 1907.

The board of directors of a private corporation was by the common law authorized to sell or otherwise dispose of the property of the corporation, subject to the limitation that it could not sell or dispose of its entire property. Forrester v. B. & M. Co., 21 Mont. 544, 55 Pac. 229, 353; Thompson's Com. on Corp. vol. 3, p. 2421; Id. vol. 7, p. 8356; Noyes on Intercorporate Relations, §§ 114, 281. By the Utah statute referred to, the powers of all such corporations then existing or that should thereafter be organized under the laws of the state for any of the purposes therein enumerated were manifestly extended beyond the common-law powers, and under its express terms, in view of the charter of the Alice Company, we do not think it admits of doubt that the board of directors of the latter com-

pany, in the absence of any fraud or lack of good faith, and with the consent of the majority of its stockholders, was empowered to sell and dispose of all of the property of that corporation.

[6, 7] It is true that at the time the Alice Company was incorporated the above-quoted provision of the Utah statute had not been enacted, but there was then in force a statutory provision of the territory authorizing the amendment, alteration, or repeal of the statute under which the company was incorporated (Comp. Laws Utah 1876, p. 232), which power was subsequently made a part of the fundamental law of the state (section 1, article 12, of the Constitution). Such reserved power, it was held by the Supreme Court of the state in the case of Garey v. St. Joe Mining Co., 32 Utah, 497, 91 Pac. 369, 12 L. R. A. (N. S.) 554, does not extend to an agreement, which the statute had permitted the stockholders of a corporation it had authorized to be incorporated to make among themselves, that its stock should be paid for in full and thereafter be nonassessable. But there was no agreement of that nature in the articles of incorporation of the Alice Company, by which, as has been seen, the corporation was given the general power to buy, lease, hold, own, operate, and sell, mines, mining claims, mills, mill sites, reduction and refining works, and to do all kinds of business incident to, connected with, or convenient for the management of a general mining business.

There is in the powers thus conferred by its charter on the Alice Company no express prohibition against the sale of all of the property of the corporation; nor is there in the case any express agreement either between the corporation and its stockholders, or between the stockholders themselves, that such a conveyance should not be made—the most that can be claimed in that regard being that a conveyance of all of the property of the corporation might terminate the business of the company and thus defeat the objects of its incorporation; but not necessarily so, for, as said by the Supreme Court of Montana in Forrester v. B. & M. Co., 21 Mont. 544, 559, 55 Pac. 229, 235:

"A transfer or other disposition of all its property will not ipso facto dissolve a corporation, although the practical effect thereof may be to defeat the object of its organization. This is so because ownership or possession of property is not essential to corporate existence. Gans v. Switzer, 9 Mont. 408, 24 Pac. 18; 9 Am. & Eng. Ency. Law (2d Ed.) 565. A flourishing mining corporation may desire to sell or otherwise dispose of its entire assets for the purpose of reinvesting the proceeds in a new enterprise within the corporate purposes, or of acquiring other mining property. Such sale or other disposition might be made at common law with the unanimous consent of the stockholders, without working a dissolution; nor would a dissolution be produced by the sale or assignment of the whole property of an insolvent corporation made by the directors, either with or without the consent thereto of all the stockholders therein."

In Thompson on Corporations, § 90, it is said:

"The reserve power of the Legislature extends, not only to altering the charter for any purpose connected with the public interests, but also to altering it for the mere purpose of changing the rights of the corporators as among themselves. This view has been taken in New York, in Massachusetts, in Illinois, in Missouri, and in other states. A necessary result of this doctrine is that the Legislature may authorize any change in the organization, purposes, or powers of the corporations which the majority might desire, contrary to the will of the minority."

Upon that subject there is more or less conflict in the decisions of the courts; but we find it unnecessary to pursue or decide the question in this case, for the reasons already suggested. In the instant case the sale was made in exchange for stock in another corporation, with the intention by the board of directors of the Alice Company, as is claimed on behalf of the appellees, to thereafter apportion the stock so acquired among the stockholders of the company, or its cash value to such of them as preferred cash, and thereafter to wind up its business and disincorporate the company.

The appellees dispute both the validity of the exchange and the intent with which it was made; but we find it unnecessary to decide either of those questions, because of the views we entertain regarding the two remaining points presented by the record. It appears that Ryan was a director and the president of the Alice Company, the managing director of the Anaconda Company, a director and the president of the Amalgamated Company, and a director and the president of the Butte Coalition Company; that Thayer was a director and the president of the Anaconda Company, and a director of the Butte Coalition Company, while the latter company owned a large majority of the stock of the Alice Company, and 500,000 shares of the stock of the Anaconda Company. And although the trial court acquitted both Ryan and Thayer of any intentional wrong, saying in its opinion that it saw nothing to "inspire belief that they aimed at aught but fair bargaining, or that they designed injury to Alice and consciously abused their trust," yet said that, though the common directors were not a majority of either board, it—

"is a difference in degree, but not in principle. They may have dominated the board. In both cases is divided duty, conflicting interests, possible impaired judgment of unknown effect, difficulty of proof, and danger to stockholders. In either case, inadequacy of price is unfairness, and condemns without further inquiry in an attempt to determine whether due to corruption or honest, but mistaken, judgment unconsciously swayed by adverse interest. There is no safety otherwise."

[8] At the beginning of the suit Judge Hunt, in granting an injunction pending the litigation restraining the disposition by the Alice Company of the 30,000 shares of the stock of the Anaconda Company, held upon the showing then made that Ryan, as managing director of the Anaconda Company, "must have had some specific, detailed knowledge of ore bodies in the Alice, their extent, character, and value, which would warrant the payment of $1,300,000 for the property, is an irresistible inference. We all know that the science of mining has been so far advanced within the last 15 years that it enables engineers to express clear and definite opinion of mine values. Mere chances have given way to highly reasonable expectations based upon exploitation, study of geological conditions, assays, mineralogy, and improved commercial facilities for reducing ores," and further held (and, as we think, very correctly) that upon principle contracts between corporations having a common director should be regarded very much as are contracts between individual directors and their corporations, and that while such contracts are not prohibited, and are not prima facie void or fraudulent, they are voidable, and that the burden rests upon those who seek to

sustain them to show clearly and satisfactorily that they are entirely fair and free from wrong—citing with approval what is said upon the subject in 2 Thompson on Corporations, §§ 1242, 1243.

[9] The trial court held that by the evidence given that burden was not sustained, with which conclusion we agree, not only because of the inadequacy of the consideration, but because it appears in part from Ryan's own testimony that all of the knowledge respecting the Alice properties within the possession of the buying corporation of which he was managing director was not communicated to the stockholders of the Alice Company, of which he was likewise a director and also its president, and whose directors it is manifest from the whole record he dominated. From his testimony we extract as follows:

"The price was fixed by general conference; in the matter of the Alice Company the price was fixed more or less arbitrarily. There was nothing in the value of the mines; there was nothing demonstrated that anybody could fix any value on. It was matter of trade between the representatives of both companies. Of course, when I closed out with Mr. Heinze, I was on one side, doing the best I could for the Amalgamated, and Mr. Heinze was doing the best he could for his company. When we traded with Clark, Mr. Clark was looking after the interests of his company, and I was looking after the interest of the Anaconda and the Amalgamated Company. The Alice Company appointed a committee to confer with a committee representing the other companies. I think the board of directors appointed the committee, and I was president of the board at the time. I don't remember who the members of the committee were. My associates upon the board, representing the Alice negotiations, were Mr. Carson and Mr. Thornton. They were the two that I relied on more than anybody else in the Alice Company. They were not connected with the Anaconda, or with any of the other Amalgamated companies; but they were directors of the Alice, both men of very good knowledge of the Butte camp and its history, and as good a knowledge as anybody had of the Alice Company. Mr. Carson was manager of the Lexington mills, the adjoining property to the Alice, for years when it was in operation, and just before it closed, and probably had as intimate knowledge of that important district and Lexington districts as anybody who was then living. I don't recall who represented the Anaconda Company. There were committees representing the different companies that were in negotiation for the purchase on the part of the Anaconda Company and for the sale on the part of the other companies. I don't know that Mr. Thornton, Mr. Carson, and myself agreed readily upon the price; but I don't recall any dispute. In reality, the price was arbitrarily fixed. It had to be. It could not be otherwise. The price was not fixed by me; neither the price on that or any of the other properties. I was very careful to see it was not. I realized that just such a question as this would be asked. I don't know that I would have so little common sense as to order on the part of the Alice Company, prior to the sale of the Anaconda, an investigation to be made by anybody to ascertain the then value of the Alice property. The Alice had no value, except as to its mine. The whole matter of the value of the Alice mine was discussed pro and con at the time I took that option, and, as I say, all the talent in our organization was criticizing me for taking that option. Nothing had developed after that time, up to the time of the transfers of these properties to the Anaconda Company, in the Alice mine, or on the Alice mine property, that was worthy of investigation. We all knew the development of the adjacent property in a way, and enough to guide us in our judgment as to the effect of that value on the Alice Company. The committee that were looking after the Alice end of the trade certainly satisfied themselves what they thought was a reasonable value for the property, and made investigations accordingly, I have no doubt. All of the committees representing all the companies did that; that being a part of the arrangement. * * * I produced the statement which you requested—Complainants' Exhibit A, October 7, 1913, showing the production of copper, silver, and gold of the Badger State mine

since the commencement of operations on that property to June 30th of this year. At the present time the lowest level in the Badger State mine is approximately 2,000 feet in depth. The extraction of ore in commercial quantities began, I think, at about 1,200 feet. That vein is probably a continuation of the Jessie vein (one of the veins that crossed the property of the Alice Company). I think there was a lean zone in the North Butte property at about that depth; but the Jessie was worked and produced ore practically from the surface, not in the same high grade bodies that were encountered from about 900 down. I think the 2,000 and 2,200 foot levels in the North Butte—by common repute; I have never seen them myself—are not as good levels as above and below. I can tell you, from my mine report, that I have here the distances east and west of the working shaft of the Badger State that the developments have extended. On the 2,000-foot levels the workings extend easterly 74 feet and westerly 69 feet from the cross-cut. I cannot find any report of Professor Kemp and Mr. Keller and Mr. Klepetko bearing particularly on the Alice property. I am quite sure that they did not make a written report particularly on that property, because they were employed by the different companies in the Anaconda consolidation to value plants, to inspect workings, and to generally pass upon the value of operating properties, which, of course, was impossible in the case of the Alice, as there was no plant, and the workings were not accessible, on account of the mine being filled up with water, up to about the 700-foot level. So far as the Alice Company is concerned, there was no written report from any engineer on the property preparatory to, or anticipatory of, the sale. Mr. Thornton and Mr. Carson, both of whom are engineers with considerable experience in the valuation of mining properties, particularly in Butte, were directors of the Alice Company, and conferred with me as president of the company, and very largely determined the value of the property for the purposes of the trade. Professor Kemp did not make any report to the Alice Company. Of that I am certain. The circular to the stockholders, issued by the directors, was all the information the directors or anybody else had, and was sent to the stockholders previous to the meeting at which they were asked to vote on the acceptance or rejection of the offer of the Anaconda Company to buy the Alice property. I did not have specific information concerning the property from Mr. Buzzo [for years superintendent of the Alice Company]; but I had general information. Mr. Buzzo did not talk enthusiastically about the property, as I remember it; but he was very anxious to have the Alice property fall into the hands of some one who had money enough, or could find money enough, to open it up and develop it, in the hope that something could be developed to make it a valuable property. So far as I was able to judge, he gave me whatever information he had concerning the property."

We find in the record no evidence that Ryan ever conveyed to any of the complaining minority stockholders of the Alice Company any of the information concerning its property, or its probable or possible value, communicated to the Anaconda Company by the experts referred to in the foregoing testimony. And certainly there is no such information, contained in the circular letter to the stockholders of the Alice Company, referred to by the witness as having been signed by him and its other directors, advising the acceptance of the proposition of the Anaconda Company, which circular letter we insert:

"New York City, New York, April 27, 1910.
"To the Stockholders of the Alice Gold & Silver Mining Company:
"You are advised that a special meeting of the stockholders of the company has been called to meet at the principal office of the company in the Utah Savings & Trust Building, Salt Lake City, Utah, on Friday, the 27th day of May, 1910, at the hour of 10 o'clock a. m. The purpose of the meeting is to submit to the consideration of the stockholders, and to have them pass upon, a proposed contract of sale between the company and the Anaconda Copper Mining Company of Montana. The proposition, if approved by the holders of the necessary amount of the capital stock of the company, will result in the sale and

transfer of all of the property and assets of the company to the Anaconda Cop-per Mining Company, in consideration of the issuance and payment by the lat-ter company of 30,000 shares of the full-paid capital stock of said company. In submitting this proposition to the stockholders, and advising its acceptance, the management wishes to state that the Alice Gold & Silver Mining Company was incorporated under the laws of Utah on the 16th day of March, 1880, with a capital stock of $10,000,000, divided into 400,000 shares, having a par value of $25 each, all of which stock was issued in acquiring certain mining proper-ties near Walkerville, in the county of Silver Bow, state of Montana. The mines of the company were operated actively from 1880 until 1893, and after-wards for a short period during the years 1897 and 1898. The total dividends which were paid from March 15, 1881, to March 15, 1898, amounted to $1,075,-000. During the period of active operation, silver was the chief product of the company. During the year 1893, because of the market decline in the market price of silver and the lean values of the ores which were developed in the lower levels of the company's mines, it became necessary to close down its property, and practically no operations have since been conducted by the com-pany, and no revenues have been received, except a comparatively small sum realized from the royalties paid by lessees working in certain portions of the older levels of the mines. As a result of closing down the mines of the com-pany, the same filled with water up to the 700-foot level, and the workings be-tween that level and the 1,500-level have been and now are inaccessible. A bal-ance sheet, showing the condition of the company on March 31, 1910, and a profit and loss account, showing the result of such operations as have been con-ducted by the present management, are attached hereto and marked respective-ly Exhibits A and B. In 1908 the Butte Coalition Mining Company acquired by purchase from the former owners a majority of the stock of the company. The market price of silver, taken in connection with the low grade of the ores exposed, has been such that the mines of the company could not be worked at a profit, and in view of the depleted condition of the treasury of the company the management has not felt justified in endeavoring to carry out any exten-sive system of prospecting or development work. Recently the stockholders of other companies, to wit, the Boston & Montana Consolidated Copper & Silver Mining Company, Washoe Copper Company, Big Blackfoot Lumber Company, Butte & Boston Consolidated Mining Company, Trenton Mining & Development Company, Red Metal Mining Company, Diamond Coal & Coke Company, and Parrot Silver & Copper Company, have taken steps to effect a consolidation of all the property owned by them, by a sale of their respective properties to the Anaconda Copper Mining Company, for certain amounts of the capital stock of the Anaconda Copper Mining Company, and the last-named company, in pursu-ance of the same general plan, has offered to purchase all of the property of this company, paying therefor 30,000 shares of the capital stock of the Anacon-da Copper Mining Company. By the consolidation above referred to the Ana-conda Copper Mining Company has acquired the most important mining ground in the Butte district, and it is believed that it will be enabled, through the adoption of general systems of drainage, ventilation, and development, to pros-pect in an economical manner the undeveloped portion of the property thus ac-quired. This company is the owner of comparatively large areas of mining property which lie contiguous to some of the property belonging to the Ana-conda Copper Mining Company, and which it is believed are of sufficient value to justify prospecting and development, provided the same can be carried on by a company strong enough financially to [bear the] burden of so doing. In addition to the cost which the resumption of active mining operations would entail, you are advised that it would be necessary to construct and equip new mills or reduction works of modern design and suitable character to handle the ores of the company economically, provided such ores were encountered in suf-ficient quantity to justify the continuance of mining operations. Such action would require the expenditure of large sums of money, at present unavailable. You are therefore advised that in the opinion of the management it would be to the best interests of this company and its shareholders to accept the propo-sition of the Anaconda Copper Mining Company. You are therefore requested to sign the accompanying proxy and return it in the inclosed envelope, wheth-

er you expect to be present at the meeting or not, in order that the stock owned by you may be represented and voted at the special meeting of the stockholders. Very respectfully, John D. Ryan, J. W. Allen, W. D. Thornton, A. C. Carson, E. S. Ferry, Board of Directors."

There is in the foregoing letter, not only none of the information derived by Ryan from the experts of the Anaconda and its associated companies respecting the actual probable or possible value of the properties of the Alice Company, nor any intimation of any intention of the board of directors of the latter company to wind up its business and obtain its dissolution, and, as a matter of fact, as the evidence shows, no move to that end was made until about one year after the sale and conveyance of all of the property of the company. The court below, having found that an adequate price had not been paid for the properties in question, for which reason the appellees had not sustained the burden resting upon them to show that the sale was a fair one, and having held that it could not be legally made in consideration of stock in the Anaconda Company, based upon its interpretation of the decision of the Supreme Court in the case of Mason v. Pewabic Mining Co., 133 U. S. 50, 10 Sup. Ct. 224, 33 L. Ed. 524, entered an interlocutory decree to the effect that the entire property be offered at public sale by the master of the court, upon prescribed notice, and that if an amount in excess of the value of the stock given for it by the Anaconda Company—which the court fixed at $1,500,000—was not bid for it, the sale should stand confirmed; and, it having subsequently been shown to the court that at the offer of the property at public sale as provided in and by the interlocutory decree no bid was made, the court entered the final decree affirming the sale.

I am unable to see that the decision of the Supreme Court in Mason v. Pewabic Mining Co. in any respect sustains such decree. In that case a corporation of Michigan, with a capital stock of 20,000 shares of the par value of $25 each, afterwards increased to 40,000 shares, had become dissolved by the expiration of its charter on April 4, 1883, notwithstanding which fact the directors, who were elected in March of that year, continued the ordinary business of the corporation, and, among other things, made an assessment of $88,000 on the capital stock, which was paid. On the 28th of March of the following year, at a meeting called "for the election of directors and for other purposes," these resolutions were adopted, against the vote and the protests of the complainants to the suit, who were minority stockholders of the old company:

"Resolved, that the board of directors be authorized to sell and dispose of the property of the company for a sum not less than $50,000; that the president and secretary be authorized to execute all conveyances necessary to carry out the contract for the sale of the property of this company made by the board of directors; and that the board of directors be, and hereby are, authorized to close up the business of the company.

"Resolved, that it is the sense of this meeting of stockholders that the property shall be sold to a new corporation, organized under the laws of Michigan, on the basis of 40,000 shares, and that the stock of such new corporation shall be issued to and received by the stockholders of this company in payment for the same, stockholders to have the right to receive [an] equal number of shares in [the] new company, if they so elect, on surrendering cer-

tificates of this company, within 30 days after April 12, 1884, and in case a stockholder does not take stock of the new corporation he is to receive his pro rata share in money."

The vote in favor of the adoption of the resolutions was 27,919 shares, against 6,754 shares in the negative. A new corporation, called the Pewabic Copper Company, was thereupon organized under the laws of the same state, also with a capital stock of 40,000 shares, at $25 each, which was taken up by the defendant corporators, who, with two others, were named as the first directors, being the same persons who controlled the old company. The third article of this association declared that no cash is actually paid on the capital stock—the cash value of real and personal property conveyed to the company contemporaneously with its organization being the sum of $50,000. The bill prayed for an injunction and restraining order, forbidding the defendants from carrying out the purpose of transferring the property of the Pewabic Mining Company to the new corporation, and for the appointment of a receiver to take charge of the effects of the old company, that they might be sold, the debts of the company paid, and the remainder of the proceeds distributed among its stockholders. Upon the issues made and proof taken the trial court decreed that the business of the Pewabic Mining Company be wound up, and that all of its assets—

"be sold at public vendue for cash to the highest bidder: Provided, that if at such sale the bid for the aggregate of the property and assets should not be in excess of $50,000 above the amount of the debts of the company existing at the time of the sale, then the arrangement for the sale of such property, made at the stockholders' meeting in Boston on the 26th day of March, 1884, as set up in defendants' answer, shall be carried out under the direction of the special master, hereinafter designated, and as provided by the resolution adopted by the stockholders at said meeting."

The decree proceeded to refer the cause to a special master for these purposes and with these powers: That he should ascertain the assets, property, and debts of the company, and that after ascertaining and reporting the same to the court the master should proceed, upon giving the required notice, to sell the property at public sale to the highest bidder in one body, with a provision to the effect that, if the highest bid for such property at such sale should amount to more than $50,000 over and above the indebtedness of the company—

"then that the arrangement for the sale of said property, made at said meeting of the stockholders at Boston, must be set aside and held to be null and void, and the Pewabic Mining Company be enjoined perpetually from selling to the Pewabic Copper Company, and that company is enjoined from receiving its transfer of the property."

The decree further declared that the directors of the old company—

"are not liable to pay to complainants and other stockholders any money received by them since the expiration of the charter of said Pewabic Mining Company, April 4, 1883, and that an accounting by said defendant directors is hereby denied as to such expenditure made by them after the expiration of the charter."

This last provision of the decree in favor of the directors of the old company was reversed by the Supreme Court, while the other portions of the decree were by it affirmed; the court saying:

"With regard to the main question, the power of the directors and of the majority of the corporation to sell all of the assets and property of the Pewabic Mining Company to the new corporation under the existing circumstances of this case, we concur with the Circuit Court. It is earnestly argued that the majority of the stockholders—such a relatively large majority in interest —have a right to control in this matter, especially as the corporation exists for no other purpose but that of winding up its affairs, and that, therefore, the majority should control in determining what is for the interest of the whole, and as to the best manner of effecting this object. It is further said that in the present case the dissenting stockholders are not compelled to enter into a new corporation with a new set of corporators, but have their option, if they do not choose to do this, to receive the value of their stock in money. It seems to us that there are two insurmountable objections to this view of the subject. The first of these is that the estimate of the value of the property which is to be transferred to the new corporation and the new set of stockholders is an arbitrary estimate made by this majority, and without any power on the part of the dissenting stockholders to take part, or to exercise any influence, in making this estimate. They are therefore reduced to the proposition that they must go into this new company, however much they may be convinced that it is not likely to be successful, or whatever other objections they may have to becoming members of that corporation, or they must receive for the property which they have in the old company a sum which is fixed by those who are buying them out. The injustice of this needs no comment. If this be established as a principle to govern the winding up of dissolving corporations, it places any unhappy minority, as regards the interest which they have in such corporation, under the absolute control of a majority, who may themselves, as in this case, constitute the new company, and become the purchasers of all the assets of the old company at their own valuation. The other objection is that there is no superior right in two or three men in the old company, who may hold a preponderance of the stock, to acquire an absolute control of the whole of it, in the way which may be to their interest, or which they may think to be for the interest of the whole. So far as any legal right is concerned, the minority of the stockholders has as much authority to say to the majority as the majority has to say to them: 'We have formed a new company to conduct the business of this old corporation, and we have fixed the value of the shares of the old corporation. We propose to take the whole of it, and pay you for your shares at that valuation, unless you come into the new corporation, taking shares in it in payment of your shares in the old one.' When the proposition is thus presented, in the light of an offer made by a very small minority to a very large majority, who object to it, the injustice of the proposition is readily seen; yet we know of no reason or authority why those holding a majority of the stock can place a value upon it at which a dissenting minority must sell, or do something else which they think is against their interest, more than a minority can do."

The court proceeded to liken the rights of the parties to that suit in regard to the assets of the dissolved corporation to those of a partnership on its dissolution, and concluded its opinion upon that point as follows:

"We do not say that there may not be circumstances presented to a court of chancery, which is winding up a dissolved corporation and distributing its assets, that will justify a decree ascertaining their value, or the value of certain parts of them, and making a distribution to partners or shareholders on that basis; but this is not the general rule by which the property in such cases is disposed of, in the absence of an agreement."

In all this I see nothing to justify the decree appealed from. There the corporation had ceased to exist. Its former directors had become trustees, whose duty it was to reduce the property of the corporation with all reasonable diligence into cash, and, after paying the legitimate

245 F.—16

indebtedness, to distribute the proceeds remaining among the stockholders. Instead of doing so, they organized a new corporation, to take over the property of the old one, and offered to award to the dissenting stockholders their proportionate shares of the stock of the new company, or to pay them for it on the basis of $50,000 for the entire property. In that case the minority stockholders of the corporation that had ceased to exist asked that its property be sold, and the court so decreed, but in doing so directed that in the event no bid in excess of $50,000 should be received that the resolution that has been referred to should be carried out, and payment made to the complainants on the basis of $50,000 as the value of the company's property; the defendants by their answer having continued their offer to pay on that basis. That portion of the decree awarding the complainants the protection mentioned does not appear to have been appealed from by either party, and was not reviewed by the Supreme Court. While affirming the order directing the sale, as has been seen, that portion of the decree appealed from which denied to the complainants an accounting by the trustees of the dissolved corporation was reversed.

Here the complainants were minority stockholders of an existing corporation, not asking for, but protesting against, the sale of its property. I think the cases wholly unlike, and am of the opinion that the judgment should be reversed, and the case remanded to the court below, with directions to enter a decree for the return to the Anaconda Copper Mining Company of the 30,000 shares of its capital stock, together with any and all dividends that have been paid thereon, and annulling the sale and conveyance to it of the properties of the Alice Gold & Silver Mining Company, the appellants to recover costs of suit.

How a sale of all of the property of a private corporation, for an inadequate price and which is otherwise unfair and wholly illegal, made by its board of directors with the consent of a majority of the stockholders, but in spite of the dissent of a minority of them, can be subsequently rendered legal by offering the property at public sale, to see if at such sale it will bring more, I am unable to understand. The offer at public auction of property of the nature of that here involved, even if there be bidders, is, in my judgment, but little, if any, test of its real value. Many courts have refused to permit evidence of what property brought at a judicial sale at public auction to be given in proof of value, while others, although admitting it, refer to it as only slight evidence. Martinett v. Maczkewicz, 59 N. J. Law, 11, 35 Atl. 662; In re McAusland (D. C.) 235 Fed. 189, 190; Rickards & Co. v. Bemis & Co. (Tex. Civ. App.) 78 S. W. 239; Street Ry. Co. v. Walsh, 197 Mo. 392, 94 S. W. 860.

In the present case there was no bidder at all; thus, according to the decision of a majority of this court, there was rendered legal and valid the sale and conveyance of the entire property of an existing corporation, which sale and conveyance it was found and adjudged by the court below, and is found and adjudged by this court, were at the time they were made unfair and wholly illegal.

From that conclusion I respectfully dissent.

GILBERT, Circuit Judge (with whom concurs WOLVERTON, District Judge). We concur in the opinion of Judge ROSS, except in his conclusion that the sale to the Anaconda Company should be annulled.

[10, 11] It cannot be denied that the majority of the stockholders of the Alice Company had the right to sell the corporate property. After the sale, and at a meeting regularly called and held under the authority of the laws of Utah, the requisite number of the stockholders passed a resolution directing that the corporation be dissolved, its affairs wound up, and its assets distributed. The appellants had no power to prevent dissolution against the will of the majority. Nor had they the right to say that a sale should not be made to the Anaconda Company, if that company outbid others. They had, however, the right, and that right the court below secured to them, to have the property sold free from the effect of any unfair combination between the majority stockholders and the Anaconda Company.

[12] The court below followed the rule of Mason v. Pewabic Mining Co., 133 U. S. 50, 10 Sup. Ct. 224, 33 L. Ed. 524, which holds that any stockholder can require that, upon dissolution, the corporate property shall be sold to the highest bidder for cash, and not to another corporation in which the majority stockholders are interested, and on terms fixed by them. There is no essential difference in principle between that case and this, and no substantial difference in the facts. The only difference is that in the Pewabic Case the minority stockholders were in court, insisting on their right to a sale at public auction, while in the case at bar the minority assert that no sale whatever should be made. Upon the law and the facts they are in no position to prevent a sale, nor to thwart the purpose of the majority to sell to another corporation. When they subscribed to their stock, they assented to the laws of Utah governing the distribution of assets of corporations, and they must abide by them. Nor is any relevant distinction to be found in the fact, as asserted, that in the Pewabic Case the corporation had ceased to exist, while in the present case the corporation was still in existence. It is true that the charter of the Pewabic Mining Company had expired; but under the laws of Michigan it continued to be a body corporate, for all purposes except that of continuing in business, and among the permissible functions of its continued existence as prescribed by law was that of winding up its affairs, disposing of its property and dividing its capital stock. In 10 Cyc. 1302, it is said:

"So if, in the exercise of a sound discretion, the majority of the shareholders deem it expedient to do so, they may sell out the whole property of the corporation to a new corporation, taking payment in its shares, to be distributed among such of the old shareholders as may be willing to take them. * * * If it is conceded that such action on the part of the majority is lawful, then the principle follows that the judicial courts will not examine into the affairs of the corporation for the purpose of determining whether the action is expedient, or for the purpose of scanning the motives which have led to it."

In J. H. Lane & Co. v. Maple Cotton Mills Co., 226 Fed. 692, 141 C. C. A. 448, the Circuit Court of Appeals for the Fourth Circuit said:

"The courts cannot pass upon the question of expediency of dissolution and sale, for that is the very question which the Legislature has authorized the majority of the stockholders to decide. * * * The courts cannot say that

the discretionary power of the majority, conferred by the statute, does not extend to the dissolution of a prosperous corporation, or to a dissolution which will probably result in practical consolidation by the purchase of the property by another corporation. The fact that the state has not provided for consolidation without a dissolution of the corporation and sale of the property by no means implies that there is any policy of the state against dissolution and sale resulting in consolidation."

The majority of the stockholders have rights which the court must recognize and protect. They have the right to retain the benefit of the sale already made unless a sale for a higher price can be made. This was the protection afforded the majority stockholders in the Pewabic Case, and it is here afforded by the decree of the court below.

The decree is affirmed.